Docket No. 108986.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ROBERT BECKER, Appellee.

*Opinion filed December 2, 2010.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

The principal issue presented for review in this appeal is whether the trial court abused its discretion when it excluded, at trial, the expert testimony of Dr. Katherine Okla, concerning the reliability/credibility of hearsay statements made by O.B., the alleged child victim of a sexual assault. The court had deemed the statements "reliable"–and thus admissible at trial–following a pretrial hearing conducted pursuant to the provisions of section 115–10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115–10 (West 2006)). Okla provided extensive testimony at that hearing. A secondary issue is whether statements of the victim, made five months after the alleged abuse, were sufficiently reliable to be admissible at trial.

On appeal below, with one justice dissenting, the appellate court reversed the judgment of the circuit court and remanded for a new trial, holding that the trial court had erred in excluding the defense expert's testimony on the ground that it would usurp the jury's role as the arbiter of the victim's credibility. Although the appellate court found it was unnecessary to decide the remaining issues raised by defendant in light of the foregoing determination, the court nonetheless addressed "the admission of hearsay statements and the closed courtroom during [the victim's] testimony since both issues are likely to arise again on remand." No. 3–07–0660 (unpublished order under Supreme Court Rule 23). The appellate court discerned no error in closure of the courtroom, nor in admission of most of the hearsay statements at issue; however, the appellate court majority did conclude that the trial court abused its discretion in allowing evidence of the victim's belated statements of September 19, 2003, and the court "preclude[d] their admission on remand." No. 3–07–0660 (unpublished order under Supreme Court Rule 23). Justice Holdridge dissented from that finding and from the majority's determination that Okla's testimony was improperly excluded at trial. For the reasons that follow, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

## BACKGROUND

Defendant, Robert Becker, was charged by indictment in the circuit court of Peoria County with predatory criminal sexual assault of a child (720 ILCS 5/12–14.1(a)(1) (West 2002)) and criminal sexual assault (720 ILCS 5/12–13(a)(3) (West 2002)). The alleged victim was defendant's three-year-old daughter, O.B. Defendant was initially found guilty after a bench trial and was sentenced to 14 years in prison. On appeal, his convictions were overturned, the appellate court having found that defendant had received ineffective assistance of counsel. *People v. Becker*, No. 3–05–0106 (2005) (unpublished order under Supreme Court Rule 23).

Prior to retrial, the State sought to introduce four hearsay statements made by O.B: (1) an April 21, 2003, statement she made to her mother, Amy Becker, immediately after returning from her father's house; (2) a statement made to her mother in May of 2003, about a "blue microphone"; (3) a July 1, 2003, videotaped interview

-2-

with Detective Michael Eddlemon; and (4) a September 19, 2003, statement she made to her mother in the presence of her mother's friend, Olga Reyes.

The court scheduled a hearing, pursuant to section 115–10 of the Code (725 ILCS 5/115–10 (West 2006)), to determine whether the statements in question should be admitted at trial. Pertinent to our present inquiry, section 115–10 provides for admission of evidence and testimony concerning a statement of a child victim of sexual abuse, relating to the abuse, where the court finds, after a hearing, "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115–10(a), (b)(1) (West 2006). If the statement is admitted at trial, "the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115–10(c) (West 2006). Prior to the section 115–10 hearing, the State moved *in limine* to exclude Okla from testifying at both the section 115–10 hearing and the trial. The trial court admitted Okla's testimony for purposes of the section 115–10 hearing, but ultimately excluded it for purposes of trial.

At the section 115–10 hearing, Amy Becker testified regarding the statements made by O.B. in April and May of 2003. Amy stated that she picked her children up from defendant's Peoria residence on April 21, 2003, after visitation. On the way home from defendant's house, O.B. threw up in the car. When they arrived in Chicago, Amy put O.B. in the bathtub. As Amy tried to wash O.B., O.B. stood up, cried, and backed away. She told Amy that her "front bottom" hurt. Amy asked O.B. what happened, and O.B. responded, "Daddy hurt my front bottom." When Amy asked her what she meant, O.B. pulled her genitals apart and pointed to her vagina.

Amy removed O.B. from the bathtub and dressed her. Amy testified she then suggested that she be O.B. and O.B. be her father, and that they act out what happened. Amy stated: "I laid down on the floor and I think she must have told me to lay down, mommy, lay down. She said, now you pretend like you're asleep. She started kind of moving my hips and she said, now you say, no, daddy, please stop,

you're waking me up. So I said, no, daddy, please stop, you're waking me up. And then she shook my shoulders and said, you woke yourself up, now go back to sleep."

Amy testified that approximately two weeks later, she was in the bathroom when O.B. came in and asked her if she knew about "dad's special blue microphone." Amy said, "No." O.B. then described it to her as blue and shiny at the top, and she said sometimes daddy poked her with it. O.B. told Amy it "hurt sometimes." Amy testified she had not been asking O.B. any questions or talking about defendant when O.B. made the statements.

On cross-examination, Amy admitted that, at a proceeding in July 2003, she had testified that when O.B. became upset in the bathtub she had asked "Is daddy hurting you?" and O.B. responded affirmatively. On redirect, Amy denied that she had initially told investigators that she had asked O.B. if defendant was hurting her.

Detective Michael Eddlemon testified that he was assigned to the juvenile division of the Peoria police department and had been with the department for 15 years. On July 1, 2003, he conducted a videotaped interview of O.B., who was four years old at the time. Eddlemon testified that the copy of the videotape presented in court fairly and accurately depicted the interview he conducted.

On cross-examination, Eddlemon acknowledged that he did not interview O.B. using any specific protocol for interviewing child abuse victims. He testified that Pam Coates, an investigator for the Department of Children and Family Services (DCFS), was also present for the interview. Both he and Coates asked O.B. questions. During the interview, O.B. stated, "My dad hurt me." Eddlemon asked, "Did your dad touch your front bottom?" O.B. responded affirmatively and whispered into Eddlemon's ear, "He put the blue microphone there." When Eddlemon asked O.B. if people were supposed to touch her there, O.B. responded in the negative. Eddlemon admitted there were numerous inconsistencies in O.B.'s answers during the course of the interview. He acknowledged that O.B. had stated the "blue microphone" came from defendant's head and that Amy had also touched her with the blue microphone. He did not ask O.B. to resolve the inconsistencies. He did, however, ask her if she understood the difference between the truth and a lie, and she stated she did. The circuit court then viewed the video.

The final statements at issue were uttered on September 19, 2003, when Amy had some friends over, one of whom was Olga Reyes. Reyes testified, as the adults talked after dinner, O.B. crawled into Amy's lap and said, "I miss my daddy, but he hurt my front bottom." Reyes indicated O.B.'s statement had nothing to do with the conversation the adults were having at the time. O.B. had never said anything to Reyes about the incident before. Later, when Amy was getting the children ready for bed, Reyes overheard O.B. say, "Don't go, I'm afraid daddy is going to hurt me. I'm afraid daddy is going to come."

Dr. Okla testified that she specializes in child and adolescent psychology and forensic evaluation, treatment and questioning in child abuse cases. Okla evaluated all of O.B.'s out-of-court statements by reviewing interview notes, transcripts and videos. She did not interview O.B. Based on her review of those materials, Okla testified that O.B. "may have been influenced" by "post-event information and improper techniques." With regard to O.B.'s statements to her mother, Okla underscored the significance of the impending divorce and O.B.'s desire to please her primary caregiver. Okla found the statements in the bathtub troubling because defendant's involvement was first suggested by Amy. She thought Amy also may have suggested the action by lying on the floor and asking O.B. to reenact the event. As for O.B.'s interviews with various professionals, Okla testified that O.B.'s psychologist used suggestive and coercive questioning during counseling. Okla suggested that those actions may have undermined the reliability of the detective's interview and "likely" impacted O.B.'s ability to accurately report the event. Okla opined that O.B.'s ongoing psychotherapy may also have affected her ability to accurately report as it was a method of "rehearing."

Okla testified that Detective Eddlemon may have intimidated O.B. in his interview with her, by telling her that he had already spoken with her mother and brother. Okla also noted the lack of ground rules at the beginning of the interview: "[S]o we don't have any way of knowing whether or not this child understood that she wasn't supposed to guess; that she was not supposed to talk about pretend; that she was supposed to ask questions if she didn't understand; that she was supposed to correct the interviewer if they [*sic*] made a misstatement." Okla stated that Eddlemon should have questioned

O.B. further on the issue of the "blue microphone" rather than accepting her terminology and moving on. In Okla's opinion, the most troubling part of the interview was the detective's failure to ask follow-up questions when O.B. changed her story and told Eddlemon that defendant pulled the blue microphone out of his head, that Amy tried to pull it out of defendant's head, and that Amy touched O.B.'s front bottom with the blue microphone as well.

Okla believed there was no reason for her to interview O.B. because "[t]here's no clean evidence left to get." Okla opined it was likely that O.B.'s memory and answers were tainted. She stated: "Now, it's too late for us to go back and say which of these things are true or false because she's heard it so many times. *** [I]t does educate you hopefully about all the reasons why you should or should not put weight on her credibility one way or the other." Although Okla did not give an ultimate opinion as to O.B.'s credibility, when asked directly by the court, Okla frankly stated her belief that O.B. could not give a "reliable" statement in person on the stand.

In a thorough 18-page order, the circuit court set forth its reasons for excluding Okla's testimony from trial and admitting the hearsay statements in question. With respect to the former ruling, the court noted, *inter alia*, defendant's response to the State's motion *in limine* wherein defendant indicated that Okla would testify "based upon the specific facts as reflected in the documented questioning and treatment of [O.B.], that *[O.B.]'s ability to testify accurately* as to the subject matter of the questioning has been significantly impaired." (Emphasis in original.) The court emphasized the mandate of section 115–10, that it is for the *jury* to determine the weight and credibility given to any statement admitted pursuant to that section, considering "the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." The circuit court stated its belief that "the law in the State of Illinois" is expressed in *People v. Wilson*, 246 Ill. App. 3d 311 (1993), and quoted the following passage in that opinion:

> "In refusing to allow defendant's expert to testify, the trial court noted that the expert testimony would unduly emphasize the children's testimony at trial, would reveal only general information about children as opposed to information about the child victims in this case, and would only provide common

knowledge that defendant could argue to the jury without the aid of an expert. We agree. The limited cognitive abilities of children are well known, and any jury can be expected to take that factor into account when determining a child's credibility. The proffered expert testimony on this point would have provided no useful information to the jury." *Wilson*, 246 Ill. App. 3d at 321.

In this case, the circuit court noted Okla's stated opinion at the section 115–10 hearing "that the child's out-of-court statements and any yet to be received testimony at trial are tainted and have a 'high probability' of having been influenced by improper questioning." Continuing, the court observed: "Incredibly, from a criminal procedure standpoint, she testified that it would be useless to interview the child further or even have the child testify at this point at trial as 'there is no clean evidence left to get.' "

Confronted with the proposed testimony of an expert, that would, in effect, advise the jury to ignore not only O.B.'s hearsay statements, but her trial testimony as well, the circuit court exercised its discretion and excluded Okla's testimony at trial. In so ruling, the court observed:

> "Virtually all of the points Defendant seeks to establish can be accomplished through cross-examination or summation to the jury as Defendant's counsel so aptly accomplished during his cross-examination of Detective Eddlemon at the 115–10 hearing. Likewise, he will be able to do that at the trial. In other words, Defendant still has, and always has had, the significant benefits and safeguards afforded by cross-examination, and those benefits should not be dismissed as inconsequential. Specifically, the Defendant will have the opportunity to cross-examine anyone testifying as to the out-of-court statements and, likely, the minor as well."

The court expressed concern that the trial could deteriorate into a situation where "two battling experts"–one for defendant and one for the State–would convey to the jury opinions as to whether the jury should believe the witness's statements, a scenario that would "significantly infringe[] upon the jury's duty to assess for itself the weight and credibility of the statements." On this issue, the court concluded:

-7-

"In offering an expert's opinion on 'O.B.'s ability to testify accurately,' Defendant is directly attacking O.B.'s credibility. There is no other possible inference. Simple common sense dictates that jurors have already connected the invisible dots and formulated the obvious answer. It invades the province of the jury on the issue of credibility, it is not to be permitted and it is not cured by simply prohibiting the obvious ultimate question from being asked. Accordingly, Doctor Okla will not be allowed to testify before the jury."

With respect to the admissibility of the victim's hearsay statements, the circuit court enumerated frequently mentioned factors considered "safeguards of reliability," and then concluded there were sufficient safeguards in this case. The court placed special emphasis upon the victim's initial statements on April 21, 2003, noting they were for the most part spontaneous and "extremely close in time to the alleged abuse [citation], and accompanied by emotion." In addition, "the minor's non-verbal description of the alleged act was beyond the developmentally usual sexual knowledge of a four year old." Moreover, the court noted there had been no counseling as of that date. The court stated "there is simply nothing in the evidence that warrants a finding that the questioning was so unnecessarily suggestive, conducive or improper such that the time, content and circumstances surrounding the statements do not provide sufficient safeguards of reliability." The court observed, with respect to statements made to Detective Eddlemon, there was a "taped interview to be reviewed directly by the jury." The court concluded "it is appropriately left to the jury to decide whether the statements contained 'no clean evidence', and whether there was any 'clean evidence left to get.' "

At the ensuing trial, the witnesses from the section 115–10 hearing gave testimony similar to their statements at the hearing. Amy testified regarding the April 21 and May 2 statements. Again, on cross-examination, Amy was confronted with her testimony from July 2003, when she testified that she asked O.B.: "Is daddy hurting you?" Amy acknowledged that she so testified. Defense counsel also questioned Amy about a statement she gave to a detective in May of 2003. The detective's report stated, "Amy thought to ask [O.B.] if her daddy had touched her there." Amy denied that she made that statement. Amy

admitted she did not say that O.B. told her to lie down when she testified at defendant's first trial, but stated that O.B. must have told her to do that because she would not have known to lie down otherwise.

Detective Eddlemon did not testify at trial, but the videotaped interview was played for the jury. The first segment of the two-part interview lasted 16 minutes. That segment of the interview depicts a conversation between O.B. and Detective Eddlemon regarding O.B.'s statements that defendant hurt her "front bottom" with a "blue microphone." O.B. is seated at a small table with Eddlemon and Coates. She appears happy and is comfortable speaking with Eddlemon. She tells him her dad hurt her "front bottom" with a "blue microphone" that he held in his hand, that he touched her "privates" in his closet and on his bed, and that he touched her "front bottom" with his hand. When Eddlemon asks where the microphone came from, O.B. points to her head and says that her father kept it in his head. She then states that Amy used the blue microphone on O.B.'s "front bottom" too. She states that her mother "tried and tried to pull the blue microphone out of Daddy's head and she finally got it!" When asked, O.B. indicates that the blue microphone was shaped like a circle and was approximately six to eight inches tall. Eddlemon then asked O.B. if she knew the difference between the truth and a lie, and she nodded her head "yes." O.B., Eddlemon and Coates then exit the room.

The second segment of the video is unremarkable from an evidentiary standpoint, other than O.B.'s disinterest in the proceedings. The three principals return to the interview room and Eddlemon states that he needs to ask O.B. a few more questions. Eddlemon asks O.B. to draw the blue microphone and she produces a picture that is unidentifiable. The caseworker then asks O.B. questions about a room in the attic or a "special" room in defendant's house. O.B. is unable to identify such a room and asks if she can watch a movie. At that point the interview ends.

Amy's friend, Olga Reyes, testified that on the evening of September 19, 2003, she heard O.B. make two statements to Amy. In the second statement, she overheard O.B. telling Amy, as the latter was putting the former to bed, that she was "afraid that daddy will come and hurt my front bottom." Reyes acknowledged that during the

earlier section 115–10 hearing, she had stated that when O.B. was in her bedroom, O.B. said, "I'm afraid daddy will come." Reyes did not testify that O.B. had used the term "front bottom" at that time.

O.B. was eight years old when she testified at trial. She told the jury when she was three she spent the Easter holiday with her father. She testified, during that weekend, defendant put hair gel in her front bottom, stuck a tall metal knife in her front bottom, and put a "blue microphone," 8 to 10 inches in length, between her front bottom and back bottom while she was sleeping on his bed. She stated that she told her mother what defendant had done while her mother was giving her a bath. She recalled talking to a doctor the next day, but could not remember the details of the conversation.

On cross-examination, O.B. had difficulty recalling many of the facts to which she had testified at the first trial. She did not remember talking to a DCFS investigator, meeting with Eddlemon or Coates, or answering "no" to the trial court when the judge asked if anything bad happened to her on Easter weekend. She also denied telling investigators that her friend, Grant, kicked her in her "privates." In response to questioning by defense counsel, she did elaborate on her description of the "blue microphone," describing it as "yellow" at the top and "blue and green on the handle." O.B. acknowledged having testified at the first trial that "it felt weird" when defendant put the "blue microphone" in her front bottom.

Pediatrician Elizabeth Powell testified that she examined O.B. in the emergency room on April 22, 2003. Her examination did not reveal any bruises or tears; however, she could see the posterior vaginal wall, which she thought was unusual for a young child, so she referred O.B. to the advocacy center.

Dr. Marjorie Fujura, a pediatrician employed by the Children's Advocacy Center, testified that she met with Amy and O.B. on June 2, 2003. After several attempts, she examined O.B. under sedation on June 11, 2003. Her physical exam of O.B. indicated that a portion of her hymen was absent. Fujura testified that she had performed 3,000 examinations on sexually abused children. She believed O.B.'s injury to her hymen was not self-inflicted, nor was it caused by a punch from another child. It was Fujura's opinion that O.B. had been sexually abused. Fujura took photographs of O.B.'s hymen. Those photos, which were admitted into evidence, showed the lower portion of

O.B.'s hymen was missing.

Dr. Ramona Slupik testified on behalf of defendant. Slupik, a board-certified obstetrician and gynecologist, was the head of pediatric and adolescent gynecology at Children's Memorial Hospital from 1990 to 1999. She examined the photographs of O.B.'s hymen and testified that O.B. had a "normal crescent hymen." She noted there were no lacerations in the hymenal tissue. Dr. Slupik stated her belief that it was "physically impossible" to insert an object of the size described by O.B. "without causing a complete tear of the hymen." In addition, a child the size of O.B. would suffer serious injury and bleeding from such penetration. Slupik's review of the photographs revealed no signs of penetration trauma.

Dr. Lela Jain also testified for defendant. She examined O.B. on May 19, 2003, in her office for a respiratory illness. During the exam, Amy mentioned O.B.'s report of possible abuse. Jain visually examined O.B.'s vaginal area and found nothing abnormal. She observed no tears or lacerations.

Defendant testified that he and Amy had been separated for several months prior to April of 2003. However, the couple maintained an amicable relationship and even attempted to reconcile at one point. Although they were in the midst of divorce proceedings in April of 2003, which included issues of custody and visitation, visitation arrangements had never been contentious prior to the allegation of abuse. Defendant had the children for Easter weekend that year, and Amy picked them up on Monday afternoon. That was the last day he was allowed to see his children. Defendant testified that he never abused the children and the accusation that he had abused his daughter was false. Defendant admitted, on cross-examination, that he left on a photo safari to Africa at a time when he was aware of Amy's "concerns" that "somebody" had sexually abused O.B., though he claimed he did not then know he was the alleged perpetrator.

The jury found defendant guilty of both counts, and defendant was sentenced to 14 years' imprisonment for predatory criminal sexual assault.

As noted, the appellate court, with one justice dissenting, reversed and remanded for a new trial. With respect to the issue of admissibility of expert testimony, the majority believed the facts of this case make

it distinguishable from *People v. Enis*, 139 Ill. 2d 264 (1990), and *People v. Wilson*, 246 Ill. App. 3d 311 (1993), and controlled by the holding in *People v. Cardamone*, 381 Ill. App. 3d 462 (2008). The appellate majority reasoned that the courts in *Enis* and *Wilson* rejected the use of the expert's testimony at trial "because it lacked applicability to the specific facts of the case." According to the majority, "[b]y contrast, Dr. Okla's testimony directly analyzed the effects of suggestion, repetition and narration on O.B.'s cognitive memory. *** She *** applied *** scientific theories to the questioning and interviewing techniques used to recall O.B.'s memory of the events of April 21, 2003." No. 3–07–0660 (unpublished order under Supreme Court Rule 23). According to the majority, "[u]nlike the experts in *Enis* and *Wilson*, Okla proposed to testify to the specific facts related to O.B.'s statements, not generalities." The majority likened the circumstances here to those extant in *Cardamone*, where the appellate court reversed the defendant's conviction and remanded for a new trial, because the trial court excluded expert testimony on this subject. No. 3–07–0660 (unpublished order under Supreme Court Rule 23). This appellate panel summarized the holding of *Cardamone* as follows:

> "The court concluded that, unlike *Enis* and *Wilson*, the experts' testimony was supported by the testimony of the victims, who reported the events at an age when young children have difficulty remembering events, had told the story numerous times even without suggestion, and were interviewed using leading and suggestive questions instead of being allowed to give a narrative response. The court further determined that the experts' testimony did not constitute improper commentary on the credibility of victims because the experts had not interviewed the victims and had not made any determinations as to whether they were credible. *Cardamone*, 381 Ill. App. 3d at 507." No. 3–07–0660 (unpublished order under Supreme Court Rule 23)

In this case, the appellate court found it significant–and indeed a fact supporting its disposition–that "Dr. Okla did not interview O.B."

As for the hearsay statements at issue, the appellate court found the initial April 21 statement reliable because it was spontaneous, it was made "within days of the alleged event," it was repeated to

Detective Eddlemon, and the language used by O.B. was consistent with the terms a three-year-old would use. The court determined that the second statement, made two weeks after the first, was also properly admitted, as it was made without significant adult prompting or solicitation, and, though it was different from the April 21 statement, it was relevant to the allegations of abuse and consistent with her later statement to Detective Eddlemon. The court found that the statements given by O.B. in the first segment of her July 1 videotaped interview were properly admitted, noting that O.B.'s previous statements were "substantially similar," that she seemed comfortable and did not appear apprehensive or concerned that she might not tell the story correctly, and her use of "sexual" terminology was typical for a four-year-old. Moreover, the fact that the interview was videotaped was "the best evidence that no adult prompting or manipulation occurred" during the course of the discussion. However, the appellate court found no relevance to the second segment of the interview, as the picture O.B. drew of the "blue microphone" was unidentifiable, and nothing of record suggests that an attic or special room might have been involved in the alleged incident, as Coates' question suggested. The court held that segment of the interview should have been excluded. No. 3–07–0660 (unpublished order under Supreme Court Rule 23)

The court made the same determination with respect to O.B.'s statements of September 19, finding the "timing of these statements *** troubling." The court noted that they were uttered five months after O.B. spent Easter vacation with her father, that she had been interviewed by two detectives and had attended counseling sessions with a psychotherapist, and the State had failed to introduce any substantive evidence regarding the first investigative interview or the therapist's interview. The court concluded, citing this court's decision in *People v. Zwart*, 151 Ill. 2d 37, 45 (1992): "[We cannot] presume from a silent record that suggestive interview techniques were not used." Almost as an afterthought, the court observed that a portion of Reyes' trial testimony was cumulative of other evidence in the case, insofar as she stated her father had hurt her "front bottom." The court noted O.B.'s statement that she was afraid of her father was a comment not previously made and suggested that the statement may have been the product of suggestive questioning during interviews.

-13-

Though the appellate court acknowledged that "delay alone may not suggest that the statements are unreliable," it believed that "the delay becomes more significant when considered in light of other factors that tend to show O.B.'s September 19 statements made in Reyes' presence lacked reliability." Thus, the appellate court majority concluded that the trial court had abused its discretion in admitting those statements at trial. No. 3–07–0660 (unpublished order under Supreme Court Rule 23).

Given its determinations of evidentiary error–principally the exclusion of Okla's testimony–the appellate court reversed and remanded for a new trial, finding, however, that the evidence properly before the trier of fact was sufficient to prove defendant guilty beyond a reasonable doubt, such that there was "no double jeopardy impediment to a new trial." No. 3–07–0660 (unpublished order under Supreme Court Rule 23).

## ANALYSIS

We begin our analysis with basic standards of review applicable to evidentiary issues. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003); *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable (*People v. Illgen*, 145 Ill. 2d 353, 364 (1991)) or where no reasonable person would agree with the position adopted by the trial court (*Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997); *Illgen*, 145 Ill. 2d at 364). Decisions of whether to admit expert testimony are reviewed using this same abuse of discretion standard. *Snelson*, 204 Ill. 2d at 24; *People v. Reid*, 179 Ill. 2d 297, 313 (1997).

In *People v. Enis*, 139 Ill. 2d 264, 289 (1990), this court prophetically cautioned against the overuse of expert testimony:

> "Such testimony, in this case concerning the unreliability of eyewitness testimony, could well lead to the use of expert testimony concerning the unreliability of other types of testimony and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-called experts can

usually be obtained to support most any position. The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses."

In an effort to curb potential abuses, this court established certain standards for admissibility. In *Enis*, this court mandated that a trial judge, when determining the admissibility of expert testimony, and when considering the reliability of the expert testimony, should balance its probative value against its prejudicial effect. *Enis*, 139 Ill. 2d at 290. In the exercise of his or her discretion, the trial judge should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before admitting it for the jury's consideration. *Enis*, 139 Ill. 2d at 290. This court has held that expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion. *People v. Cloutier*, 156 Ill. 2d 483, 501 (1993); *Enis*, 139 Ill. 2d at 288. Expert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain. *People v. Gilliam*, 172 Ill. 2d 484, 513 (1996). A trial court does not err in barring expert testimony where the matter at issue is not beyond the ken of the average juror. *Watkins v. Schmitt*, 172 Ill. 2d 193, 206-07 (1996).

In this case, the trial court was confronted with the proffered testimony of Dr. Okla, that would, for all practical purposes, advise the jury to disregard not only O.B.'s hearsay statements, but her trial testimony as well, all without Okla having even interviewed O.B. During section 115–10 proceedings, Okla stated there was no reason for her to interview O.B. because "[t]here's no clean evidence left to get." Okla said it was likely that O.B.'s memory and answers were tainted. She stated, "hopefully," her (Okla's) testimony would "educate" people why they "should or should not put weight on [O.B.'s] credibility one way or the other." When asked directly by the court, Okla frankly stated her belief that O.B. could not give a "reliable" statement in person on the stand.

Her tactical equivocation aside, there was no "one way or the other" involved in Okla's proposed testimony. Her testimony would constitute direct, adverse comment on the "credibility" of O.B., that

-15-

is "credibility" in the broadest, utilitarian sense, as defined in Black's Law Dictionary: "The quality that makes something (as a witness or some evidence) worthy of belief." Black's Law Dictionary 423 (9th ed. 2009). Given the facts of this case, the trial court did not abuse its discretion when it excluded Okla's testimony.

One basis for exclusion is the impropriety of asking one witness to comment directly on the credibility of another. Under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness (*People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989); *People v. Henderson*, 394 Ill. App. 3d 747, 753-54 (2009)) as "[q]uestions of credibility are to be resolved by the trier of fact" (*Kokoraleis*, 132 Ill. 2d at 264). While this observation in *Kokoraleis* was rendered regarding the impropriety of asking for such an opinion during the cross-examination of another witness, the error here would obviously have been magnified many times over–quantitatively and in terms of apparent authority of the source–had the trial court allowed Okla to testify as an expert at trial, offering *extensive* testimony attacking the credibility of O.B.'s out-of-court statements and her trial testimony.

Even if we were to disregard this principle, we would uphold the trial court's decision because what Okla was offering, *i.e.*, the observation that this young child, like any young child, might be influenced by suggestive questioning and improper investigative techniques, is not a matter beyond the ken of the average juror. The operative principles are matters of common knowledge and are not difficult to understand. Couching these principles in technical terms does not render them otherwise. Certainly, the concepts involved are familiar to the average citizen and no more difficult to understand than that at issue in *Gilliam*.

In *Gilliam*, defendant claimed that the trial court erroneously limited the evidence he could present to the jury on the circumstances surrounding his confession. In an offer of proof, Dr. Michael Althoff, an examining psychologist, opined that defendant's desire to protect his family made him especially susceptible to police pressures and created a form of psychological compulsion to confess. Thus, according to Althoff, defendant's confession was the product of psychological coercion. The trial court granted the State's motion *in limine* to limit Althoff's testimony. The court ruled that Althoff could

testify on defendant's mental state or condition, but could not testify on the circumstances surrounding the voluntariness or competency of defendant's confession.

Describing a procedure with some parallels to the section 115–10 procedure employed in this case, this court noted that "the admissibility of a confession that is challenged on the ground that it is involuntary is a matter for the trial court to determine in the first instance out of the presence of the jury. If the court rules that the confession is voluntary and admissible in evidence, the defendant still has the right to present evidence to the jury that affects the credibility or weight to be given the confession." *Gilliam*, 172 Ill. 2d at 512-13.

In the end, this court held that the trial court properly exercised its discretion in limiting the trial testimony of Dr. Althoff. "Whether defendant falsely confessed to protect his family is not a concept beyond the understanding of ordinary citizens, and is not difficult to understand or explain. [Citations.] Further, we note that defendant was not precluded from challenging the credibility of his confession. The jury could have reached the same conclusion as Dr. Althoff based on the facts imparted through the testimony of other witnesses." *Gilliam*, 172 Ill. 2d at 513.

The same is true here. Defendant could have apprised the jury of the circumstances surrounding O.B.'s statements through other witnesses both on direct and cross-examination. Counsel in fact did that and, in summation, discussed, in laymen's terms, the very principles Okla would have testified to. As for the principles of psychological *suggestion* defendant would have had Okla testify to, we fail to see how they are different, in any significant way, from the principles of psychological *coercion* at issue in *Gilliam*–principles that this court deemed within the ken of the average juror. Notwithstanding defendant's arguments otherwise, we believe it is a matter of common understanding that children are subject to suggestion, that they often answer in a way they believe will please adults, and that they are inclined to integrate fictional notions with reality as we know it. Are citations to scientific studies necessary to apprise jurors of these tendencies? We think not. We need only cite as an example O.B.'s claim that defendant at one time had a blue microphone stuck in his head and that Amy succeeded in pulling it out. In our opinion, defendant's argument as to the necessity of Okla's

testimony is yet another instance of a defendant who would exalt the role of the "expert" beyond its warranted dimensions. In the process, he implicitly seeks "to discredit the common sense and intelligence of those who served on the jury" (see *People v. Urdiales*, 225 Ill. 2d 354, 445 (2007)), which is a cornerstone of our system of justice.

The testimony of Dr. Okla was not necessary to make defendant's points. The limited probative value of her testimony–limited, that is, in light of the jurors' common knowledge in this area–was outweighed by the prejudice she would have interjected into the trial–commenting extensively and directly on circumstances purportedly affecting the mental processes and credibility of another witness, whom she had never even interviewed, and, for all practical purposes, telling the jurors that that witness's testimony should be disregarded. Given the facts of this case, the trial court's decision to exclude Okla's testimony was not "arbitrary, fanciful or unreasonable." See *Illgen*, 145 Ill. 2d at 364. The appellate court erred in holding otherwise.

As for the testimony of Amy's friend, Olga Reyes, regarding statements made by O.B. on September 19, 2003, we need not address the admissibility thereof as their admission at trial was harmless, assuming, *arguendo*, it was error at all.

Defendant argues that we should not address harmless error because the State did not specifically mention harmless error in its petition for leave to appeal, wherein the State argued that the appellate court erred in finding that the trial court's exclusion of Okla's testimony at trial was an abuse of discretion, and that the appellate court erred in finding that the trial court should have excluded O.B.'s hearsay statement of September 19. As we explained in *In re Rolandis G.*, 232 Ill. 2d 13, 37 (2008), "the failure to raise an issue in a petition for leave to appeal is not a jurisdictional bar to this court's ability to review a matter." When an issue is not specifically mentioned in a party's petition for leave to appeal, but it is "inextricably intertwined" with other matters properly before the court, review is appropriate. *People v. McKown*, 236 Ill. 2d 278 , 310 (2010); *Rolandis G.*, 232 Ill. 2d at 37. In this instance, we find that the consequence of admitted evidence is inextricably intertwined with the propriety of its admission.

Defendant also argues that the State's treatment of harmless error in its brief is insufficient to warrant our consideration of the matter.

We disagree. Citing, with explanation, our decision in *Rolandis G.*, the State contends, "given the appellate court's finding that the content of the statements was 'cumulative' of other evidence ***, if admission of the September 19, 2003 statements was error, it was–by definition–a harmless one." We find this argument is adequate and in fact dispositive here.

As we noted in *Rolandis G.*, when deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. O.B.'s September 19 statements fall into the third category. The testimony of Amy's friend, Olga Reyes, added nothing new for the jury's consideration. The jury was otherwise informed of O.B.'s statements that her father had hurt her "front bottom" through Amy's testimony regarding O.B.'s initial statement–a statement as spontaneous as, and more detailed than, the September 19 statements, and one uttered immediately after the abuse. The videotaped interview with Detective Eddlemon also contained more detail than O.B.'s subsequent statements. Defendant argues that the September 19 statements add "a new-found fear of [the victim's] father" that is not evinced in her earlier statements. While that may be true, it would hardly be revelatory, as the only basis for fear would have been the action of defendant in hurting her, which she mentioned in her earlier statements, and in the very statement at issue. The average citizen serving on a jury understands that. We find that admission of the September 19, 2003, statement was harmless as cumulative and duplicative of properly admitted evidence, assuming, *arguendo*, it was error at all.

With respect to the other issues that were addressed by the appellate court–the dispositions of which are not matters of discussion, controversy, or briefing here–we find no basis for disagreement. Those assessments include the appellate court's finding that the evidence, when viewed in the light most favorable to the State, was sufficient to prove defendant guilty beyond a reasonable doubt.

For the foregoing reasons, the judgment of the appellate court is

reversed, and that of the circuit court affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*