NOTICE
Decision filed 08/04/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190524-U

NO. 5-19-0524

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-2416 |
| | ) | |
| PATRICK WILSON, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions and consecutive sentences for attempted first degree murder with a finding that the defendant personally discharged a firearm, proximately causing serious bodily harm, and armed robbery with a firearm did not violate the one-act, one-crime rule because the offenses were not carved from a single physical act and each offense required proof of an element that was not part of the other offense. The court did not abuse its discretion in admitting into evidence recordings of phone calls the defendant placed to family members from the county jail where the conversations were relevant to show that the defendant was directing his family members to a large sum of hidden cash only four days after the armed robbery at issue.

¶ 2    The defendant, Patrick Wilson, appeals his convictions for attempted first degree murder

and armed robbery with a firearm arising from the robbery of a convenience store. He argues that

(1) his convictions on both charges violate the one-act, one-crime rule and (2) the court abused its

1

discretion in admitting recordings of six calls he placed from the county jail because their probative value was outweighed by the risk of undue prejudice. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The charges against the defendant stemmed from a robbery of the 402 Kwik Shop, a gas station convenience store in Collinsville, Illinois, on the night of August 15, 2017. At approximately 10:26 that night, an armed man entered the store wearing a blue bandana over his face and a Chicago Bulls cap. He demanded money from store employees Charles Atkins and Melissa Noell. Before Atkins and Noell had time to react, the armed man fired a shot that struck Atkins in the left groin. Atkins crawled to the register and opened it. The shooter took cash from inside and under the register, then fled.

¶ 5      Atkins was flown by helicopter to Barnes-Jewish Hospital in St. Louis, where he underwent surgery to repair a transected vein and received post-operative care in the intensive care unit. At trial, Atkins testified that he underwent multiple procedures and physical therapy, and that he continued to experience post-traumatic stress disorder, scarring, and pain that "comes and it goes."

¶ 6      Responding officers found a cell phone outside the Kwik Shop. A police canine directed the officers to a glove and a backpack located behind an apartment complex near the store and to a gold-colored bicycle located in a nearby tree line. Inside the backpack, officers found a debit card in the name of Patrick Wilson and a box containing 12 rounds of .38-caliber ammunition.

¶ 7      Much of this evidence was subsequently linked to the defendant. The face of the phone bore a photograph of a young girl captioned "Payton T. Wilson," the name of the defendant's daughter. In addition, a search of phone records revealed that there were four incoming calls from numbers associated with the defendant's brother and mistress shortly before the robbery. A partial fingerprint lifted from the box of ammunition was consistent with the defendant's fingerprint.

2

Finally, the defendant's neighbor testified that she had seen the defendant riding a bicycle that looked like the gold-colored bicycle found in the tree line near the apartment complex and the 402 Kwik Shop.

¶ 8 Police never recovered the weapon involved in the shooting or the Chicago Bulls cap and blue bandana worn by the shooter. They did, however, find evidence that the defendant posted a picture on Facebook in which he was wearing a cap similar to the one worn by the shooter and another picture in which he was wearing a blue bandana on his head.

¶ 9 The defendant was arrested and charged with attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), armed robbery with a firearm (*id.* § 18-2(a)(4)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and unlawful possession of a firearm by a felon (*id.* § 24-1.1(a)). The court entered a judgment of *nolle prosequi* on the aggravated battery charge before trial at the request of the State, and the charge of unlawful possession of a weapon by a felon was severed from the other charges at the request of the defendant. The matter thus proceeded to trial on the charges of attempted murder and armed robbery with a firearm alone.

¶ 10 At trial, in addition to the evidence we have already described, the State presented recordings of six phone calls the defendant made to members of his family from the county jail. In the recordings, the defendant can be heard directing members of his family to the location of $8000 in cash. The calls were placed just four days after the robbery, on August 19, 2017. The State also offered into evidence a recording of a March 4, 2018, phone call between the defendant and his wife. The admission of that recording is not at issue in this appeal.

¶ 11 The defendant objected to the admission of the recordings, arguing that they were not relevant and that the statements by the defendant's family members were inadmissible hearsay. He asserted that "the sum and substance of these conversations is the addressing of the money being

3

income tax refund proceeds." We note that in the March 2018 recording, the defendant does state that the cash was the proceeds of his tax refund.

¶ 12    The State argued that the evidence was relevant because it demonstrated that just four days after the robbery, the defendant was directing family members to the location of a large sum of hidden cash. The prosecutor further noted that she did not recall any mention of a tax refund in the calls. In response to the defendant's hearsay argument, the prosecutor noted that the statements of the other speakers were admissible to "give the conversation context."

¶ 13    At this point, the defense argued that the recordings should be excluded even if relevant because their probative value was outweighed by the risk of undue prejudice. Defense counsel pointed out that there was no allegation or evidence concerning the amount of cash that was taken during the robbery.

¶ 14    The court overruled the defendant's hearsay objection. Before ruling on the relevancy objection, the court asked the parties to address the question of the amount of money.

¶ 15    The defendant reiterated his assertion that there was no information about the amount of money taken during the robbery. He further asserted that, although the defendant's reference to his tax refund may have been in the portion of the recording edited out by the State, the reference is there.

¶ 16    The State acknowledged that it had no information on the precise amount stolen from the convenience store. The State further argued that the recordings had additional relevance because there is a mention of a .38-caliber weapon during the conversations, and forensic evidence indicated that .38-caliber ammunition was used.

¶ 17    The court overruled the defendant's objection, stating:

4

"I believe that someone hiding or directing people to hidden cash within days of an armed robbery where he took cash is relevant. I believe that discussing with someone about a caliber of weapon which is—which is the caliber of ammunition that was found in a backpack close to the scene with your client's fingerprint or alleged to be his fingerprint is relevant."

The court noted that defense counsel could cross-examine the State's witness about anything he believed was edited out, anything he thought would provide context, and any gaps in the evidence concerning amount of cash taken.

¶ 18    After the court ruled, the prosecutor stated for the record that the portions of the recordings that had been redacted were all either direct references to a 2009 robbery or statements that made it obvious that the defendant had previously been in prison. She explained that during one of the calls, the defendant spoke to his wife about clothing he would need in prison in sufficient detail that jurors could easily infer he had previously been to prison.

¶ 19    Detective Jose Cerna testified about the recordings, which were admitted into evidence and played for the jury during his testimony. He explained that the first four calls were placed to Corcea Wilson, and that the defendant also spoke with other family members during the calls, including the defendant's brother, Antwon Salmond. Detective Cerna testified that the calls were placed close in time.

¶ 20    The first four calls were played for the jury. In them, the defendant can be heard telling his family members to look for $8000 in "paper" by some steps near a church two doors down from his "crib." He describes a white gate near the church and two concrete steps leading to the church. In the fourth call, the defendant describes the cash as being "loose" and "in rubber bands." In the

first call, he tells the listeners that he "can't be playing on these phones" and that they must "read between the lines."

¶ 21　Detective Cerna testified that the defendant's description of the church with the white gate and two concrete steps was consistent with the Word of Life Church, which is located near the defendant's apartment. He further testified that "paper" is a slang term for money, and "crib" is a slang term for home.

¶ 22　Detective Cerna next testified about the fifth and sixth calls. He stated that both calls were placed to the defendant's wife, Drenecia Quilling, and that the defendant also spoke with Antonio Wilson during the calls. These calls took place on August 19, 2017, shortly after the previous calls. The fifth and sixth calls were played for the jury. In them, the defendant refers to the denominations of the bills, describing them as ones, fives, tens, and twenties. Quilling mentions a ".38," and the defendant tells her to say that it was stolen.

¶ 23　Finally, the State played a recording of the March 4, 2018, call between the defendant and Quilling. Detective Cerna acknowledged that the full recording of this call was eight minutes long, while the redacted version played for the jury was only three minutes long.

¶ 24　On cross-examination, defense counsel asked Detective Cerna about the remainder of the March 2018 call. The detective testified that the defendant "was mostly talking about his clothes," and that he also talked about his daughter, Payton. A recording of the remainder of the call was admitted into evidence and played for the jury. In it, among other things, the defendant mentioned receiving a tax refund and told Quilling to take care of Payton. Defense counsel asked, "Now with respect to these phone calls—did you ever hear reference that the sum of an 8,000-dollar figure was due to an income tax refund?" Detective Cerna replied, "Yeah, I did."

¶ 25    Testing of a DNA sample taken from the phone recovered near the scene was inconclusive. Police never recovered the weapon used in the robbery, and they also never recovered the hat and bandana worn by the robber. Atkins, Noell, and a third eyewitness were unable to identify the defendant as the robber. As mentioned earlier, the robber's face was covered by a blue bandana during the robbery.

¶ 26    Defense witnesses testified about the defendant's whereabouts at and near the time of the robbery. As stated earlier, the robbery occurred at approximately 10:26 p.m. on August 15, 2017. His brother, Antwon Salmond, testified that the defendant had been robbed previously and that his phone and backpack were taken from him. He further testified that he met up with the defendant in East St. Louis at approximately 10 or 10:15 on the night of the robbery. He stated that the defendant was with him until approximately 10:25 or 10:30. He admitted that shortly after the robbery, he told police that the defendant was not with him that night.

¶ 27    Ryeisha Rice initially described herself as a "good friend" of the defendant, but she later admitted that she was his girlfriend at the time of the robbery. Rice testified that the defendant was at her home from approximately 8:30 or 9 p.m. until approximately 10 p.m. She testified that she was going to drive him to the apartment of his sisters, Portia and Patrice Wilson, at that time, but instead, they met up with his brother. Rice stated that she eventually drove the defendant to his sisters' apartment at around midnight.

¶ 28    Portia Wilson testified that she saw the defendant at her apartment at 7 p.m. on the night of the robbery. She then went upstairs. She stated that when she came back downstairs at 11 p.m., the defendant was asleep on the sofa. Patrice Wilson testified to seeing the defendant in the Wilson sisters' apartment after midnight.

7

¶ 29　The jury returned verdicts of guilty on both counts. With respect to the attempted murder charge, the jury also found that the State had proven beyond a reasonable doubt that the defendant had personally discharged a firearm, thereby proximately causing great bodily harm to another person.

¶ 30　The defendant filed a motion for a new trial. In relevant part, he argued that the court abused its discretion in admitting the recordings of the phone calls into evidence because their probative value was substantially outweighed by the risk of undue prejudice. The court denied the defendant's motion.

¶ 31　At the defendant's sentencing hearing, the court and parties addressed the question of the one-act, one-crime rule. The court found that convictions and sentences on both charges would not run afoul of the rule. The court sentenced the defendant to consecutive terms of 45 years in prison for attempted murder and 40 years for armed robbery with a firearm. The attempted murder sentence included a mandatory enhancement of 25 years due to the jury's finding that the defendant personally discharged a firearm and proximately caused great bodily harm to Atkins. See 720 ILCS 5/8-4(c)(1)(D) (West 2018). This appeal followed.

¶ 32　　　　　　　　　　　　　　II. ANALYSIS

¶ 33　On appeal, the defendant argues that (1) his convictions on both charges in this case violate the one-act, one-crime rule and (2) the trial court abused its discretion in admitting the recordings of the phone calls he placed to members of his family from the county jail four days after the robbery. We reject both contentions.

¶ 34　　　　　　　　　　　A. The One-Act, One-Crime Rule

¶ 35　In *People v. King*, 66 Ill. 2d 551 (1977), the Illinois Supreme Court articulated what is known as the one-act, one-crime rule. The court explained that the rule is necessary because

8

prejudice results for a criminal defendant when "more than one offense is carved from the same physical act." *Id.* at 566. The court further explained that in cases involving multiple acts, even acts that are closely related, prejudice only results from multiple convictions if any are for offenses that "are, by definition, lesser included offenses." *Id.* The *King* court therefore held "that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, [multiple] convictions with concurrent sentences can be entered." *Id.* Although the *King* court limited its holding to cases involving concurrent sentences, the supreme court subsequently expanded this rule to encompass consecutive sentences as well. *People v. Artis*, 232 Ill. 2d 156, 165 (2009) (citing *People v. Rodriguez*, 169 Ill. 2d 183, 187 (1996)). If, on the other hand, two or more offenses are "carved from the same physical act," the defendant's conviction on the less serious charge must be vacated. *People v. Angelly*, 167 Ill. App. 3d 477, 486 (1988).

¶ 36    Application of the one-act, one-crime rule involves a two-step process. First, the court must determine whether the defendant's criminal conduct consisted of a single physical act or multiple separate acts. *People v. Coats*, 2018 IL 121926, ¶ 12. If the conduct consisted of multiple acts, the court must then determine whether any of the charged offenses are lesser included offenses of other charged offenses. If the defendant's conduct consisted of multiple acts and none of the offenses are lesser included offenses, "then multiple convictions are proper." *Id.* Whether multiple convictions violate the one-act, one-crime rule is a question of law. Our review is therefore *de novo*. *Id.*

¶ 37    The defendant argues that his convictions on both charges violate the one-act, one-crime rule. The State contends that the defendant forfeited this claim because his argument on the issue at sentencing consisted of a single statement asserting that both offenses involved the "single act"

9

of shooting Atkins. To preserve an issue for appellate review, a defendant must object at trial. *People v. Abadia*, 328 Ill. App. 3d 669, 680-81 (2001). Even assuming the defendant's limited argument constituted forfeiture, however, we may review a claim that has been forfeited under the plain error rule if the evidence is closely balanced or if the error is so serious that it affected the fairness of the defendant's trial or undermined the integrity of the judicial process. *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). Our supreme court has recognized that although the one-act, one-crime rule does not have constitutional implications, it is an "error *** so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Artis*, 232 Ill. 2d at 165. As such, review is appropriate under the second prong of the plain error rule. *Id*. We will therefore address the defendant's claim.

¶ 38    As stated previously, the first part of our one-act, one-crime inquiry is to determine whether the defendant's conduct consisted of more than one physical act. Here, the defendant appears to acknowledge that his conduct consisted of multiple physical acts, and we agree. An "act" for purposes of the one-act, one-crime rule is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. Convictions on two offenses are proper if an act that is common to both offenses is either (1) part of each offense or (2) the only act necessary for one of the offenses, but part of the second offense. *Smith*, 2019 IL 123901, ¶ 18. The act of shooting Atkins was common to both offenses, but the offense of armed robbery also required an additional act—the taking of the cash. We must therefore move on to the second step of one-act, one-crime analysis and consider whether either offense is a lesser included offense. *Id.* ¶ 37.

¶ 39    In the context of the one-act, one-crime rule, we determine whether an offense is a lesser included offense of another offense using the abstract elements approach. This ensures that defendants " 'are held accountable for the full measure of their conduct and harm caused.' " *Id.*

(quoting *People v. Miller*, 238 Ill. 2d 161, 173 (2010)). Under this approach, we make our determination by comparing the statutory elements of the two offenses. If all the elements of one offense are included as elements of the second offense, the first offense is a less included offense and the defendant's conviction on that offense must be vacated. *Id.*

¶ 40    Armed robbery with a firearm requires proof that a defendant committed the offense of robbery, which requires proof that the defendant (1) knowingly took property from the person or presence of another, (2) through the use of force or the threat of imminent force (720 ILCS 5/18-1(a), 18-2(a) (West 2016)), and (3) proof that the defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability or disfigurement, or death (*id.* § 18-2(a)(4)). Attempted first degree murder requires proof that the defendant (1) committed an act constituting a substantial step toward murder and (2) acted with the specific intent to kill. *Id*. § 8-4(a); *People v. Garrett*, 216 Ill. App. 3d 348, 353 (1991). Armed robbery with a firearm requires proof that the defendant took property from the victim, which is not an element of attempted murder, while attempted murder requires proof of the specific intent to kill, which is not an element of armed robbery with a firearm. As such, neither offense is a lesser included offense.

¶ 41    We note that the jury in this case was asked to find that in committing the offense of attempted first degree murder, the defendant personally discharged a firearm, thereby proximately causing great bodily harm to another individual. While this finding was related to a sentence enhancement and was not an element of the offense itself, it was a common finding to both offenses. See 720 ILCS 5/8-4(c)(1)(D), 18-2(a)(4) (West 2016). Even if we were to treat this finding as an element of both offenses, it would not alter our conclusion. Because each offense requires proof of at least one element that is not an element of the other, neither is a lesser included offense.

¶ 42    In support of his contention to the contrary, the defendant points to language in the Illinois Supreme Court's decision in *People v. Reveles-Cordova*, 2020 IL 124797. There, the question was how to apply the abstract elements test in the context of a home invasion conviction that was predicated on criminal sexual assault. *Id.* ¶ 1. In holding that, under those circumstances, the defendant's conviction for criminal sexual assault was a lesser included offense of home invasion, the court explained that "[p]roof of criminal sexual assault is a necessary element of proof of home invasion predicated on criminal sexual assault." *Id.* ¶ 21. For this reason, the court found that all the elements of criminal sexual assault were also elements of home invasion predicated upon that offense. *Id.* The court went on to put the abstract elements test a different way, stating that it "is impossible to commit home invasion predicated upon criminal sexual assault without committing criminal sexual assault." *Id*.

¶ 43    Pointing to this language, the defendant poses the following rhetorical question: is it possible to commit armed robbery with a firearm—which requires proof beyond a reasonable doubt that a defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability or disfigurement, or death—without also committing attempted murder—which requires proof of the specific intent to kill? The flaw in the defendant's argument is that the answer to this question is yes. Although the use of a firearm provides support for a conclusion that the defendant specifically intended to kill the victim, it is not necessarily dispositive of that question. See *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26; *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Evidence of the surrounding circumstances is also an important consideration. See *Ephraim*, 323 Ill. App. 3d at 1110. Here, for example, the defendant shot Atkins before he had a chance to comply with the defendant's demand for money, which provided additional evidence supporting the jury's finding of specific intent. Because attempted first degree

12

murder and armed robbery with a firearm each require proof of elements that are not part of the other offense, we conclude that neither crime is a lesser included offense. As such, the defendant's convictions on both charges do not violate the one-act, one-crime rule.

¶ 44                                 B. Admission of the Recordings

¶ 45     The defendant next argues that the court abused its discretion by admitting the recordings of the six phone calls he placed to family members four days after the robbery. He argues that the probative value of the recordings was slight, while their potential for unfair prejudice was substantial. He further argues that the recordings were, "in effect, propensity evidence." We are not persuaded.

¶ 46     Evidentiary rulings are a matter within the trial court's sound discretion. We will not reverse absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). We will find an abuse of discretion only if the trial court's ruling was arbitrary, fanciful, or unreasonable, or if "no reasonable person would agree with the position adopted by the trial court." *Id.*

¶ 47     As the defendant correctly contends, evidence of other crimes is not admissible to show the defendant's propensity to commit crimes. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). While other-crimes evidence is admissible if relevant for any purpose other than propensity, trial courts must weigh the probative value of such evidence against its prejudicial effect. *Id.* at 365. As the defendant also correctly notes, *any* relevant and otherwise admissible evidence should be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 48     The defendant argues that the recordings of the six phone calls had minimal probative value, were unfairly prejudicial, and amounted to evidence of other crimes. The rationale underlying each of these claims is his assertion that there was little to no evidence connecting the

13

cash the defendant was directing his family members to find with the cash taken during the robbery. This is so, he contends, because (1) there was no evidence concerning the precise amount of cash taken from the 402 Kwik Shop, (2) there was no reference to the 402 Kwik Shop robbery during the calls, and (3) there was no indication in any of the recorded conversations that the cash had been hidden recently. The defendant further contends that the recordings were highly prejudicial and they suggested that he committed other crimes because (1) it is unlikely that the convenience store would have as much as $8000 in cash in its register at the time of the robbery and (2) it is also unlikely that a law-abiding citizen would hide a large amount of cash under a stone next to a church.

¶ 49    The defendant appears to acknowledge that a recording of the fifth call may have some relevance to the case. During that call, the defendant's wife mentions a .38-caliber weapon. In response, the defendant tells her to say that the gun was stolen. The defendant argues that a recording of this call could have been entered into evidence without the remaining calls. We reject the defendant's contentions.

¶ 50    As we discussed earlier, the court carefully considered the content of the calls and its relevance to the case prior to ruling to admit the recordings. The conversations took place just four days after the robbery, and the hiding place described was near both the defendant's apartment and the site of the robbery. The defendant's statement that the hidden cash consisted of bills in small denominations is consistent with the type of cash likely to come from a convenience store cash register. In addition, the conversation between the defendant and his wife concerning the .38-caliber weapon is relevant because it relates to the .38-caliber ammunition found in the backpack. Thus, the recordings of the defendant's phone conversations were relevant evidence that tended to show that he had hidden the proceeds from this robbery. While it may have been theoretically

14

possible for jurors to speculate as to whether some or all of the cash came from some other nefarious source, the most likely inference to be drawn from the calls is that the defendant had robbed the 402 Kwik Shop and hidden the proceeds next to the church. We find no abuse of discretion.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the defendant's convictions.


¶ 53    Affirmed.