NOTICE

Decision filed 02/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230726-U

NO. 5-23-0726

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-2921 |
| | ) | |
| STEVEN FOSTER, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Moore* and Boie** concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant was deprived of a fair trial where he established that the admission of the phone records, including the geolocation data, and the video interview, along with the improper testimony by law enforcement regarding the defendant's credibility constituted plain error. The judgment of conviction is reversed, and the cause is remanded for a new trial.

¶ 2    A jury found the *pro se* defendant, Steven Foster, guilty of multiple counts, including three counts of attempt murder. He was sentenced to a total of 135 years in the Illinois Department of Corrections (IDOC). On direct appeal, the defendant claims that cumulative error denied the defendant of a fair trial; the circuit court failed to provide proper admonishments for waiver of

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

**For administrative reasons Justice Boie has been substituted on the panel. Justice Boie has read the briefs in this case and has listened to the recording of oral argument.

counsel under Illinois Supreme Court Rule 401(a); the State failed to provide notice before raising a transferred intent argument during its rebuttal in closing arguments; the State engaged in pervasive prosecutorial misconduct during *voir dire* and closing arguments; and the 135-year sentence was excessive given the nature of the case and the defendant's rehabilitative potential. For the following reasons, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4      On September 8, 2021, a shooting occurred at Oakwood Estates, a housing complex in Alton, Illinois, where a group of individuals were socializing outside that evening. Among this group was Kenneth (Ken) Jones, who was intoxicated. Ken began antagonizing two other people, namely Darylann Hardimon and Danyelle Gaston. The confrontation escalated and Darylann contacted her boyfriend, the defendant, who arrived shortly thereafter. The defendant argued with Ken and his friend, Charles Thompson. Law enforcement responded to the commotion and broke up the gathering. The defendant left, but others gathered again after law enforcement officers were no longer present. Then, gunshots were fired into the gathering of approximately 20 people. Three people, Charles Thompson, Jackie Sharp, and Troy Jones, were shot and hospitalized after sustaining serious injuries from gunshot wounds.

¶ 5      The defendant was charged on September 16, 2021, by information, with three counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2020)); three counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2020)); one count of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020)); one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)); and one count of unlawful possession of weapons by a felon (720 ILCS 5/24-1.1(a) (West 2020)). An indictment was returned on October 21, 2021, charging the same conduct and counsel was appointed for the defendant.

¶ 6                                    *Pretrial*

¶ 7    On September 12, 2022, the defendant filed a motion to proceed *pro se*, and the circuit court held a hearing on the defendant's motion on September 29, 2022. The defendant claimed that he did not understand the charges. Defense counsel stated that she had gone through the file, made extensive notes, and discussed the case with the defendant. The circuit court determined that the defendant was 36 years old, attended a military high school, and had earned some college credits. The defendant was able to read, write, and understand the English language. He was not under the influence of drugs or alcohol, and he did not have a physical or mental disability. The defendant had been involved in prior criminal cases but had never represented himself.

¶ 8    The circuit court read each count of the information to the defendant and specifically explained that attempt first degree murder had a sentencing range of 6 to 30 years, and that the defendant was subject to a firearm enhancement of 25 years to life for each of those charges. Because the charges involved three different victims, the defendant would be sentenced to consecutive sentences if convicted on more than one count. The circuit court emphasized that the defendant faced spending the remainder of his life in prison if found guilty. The additional charges and their sentencing ranges were also explained to the defendant. The defendant indicated that he understood each of the charges as explained by the circuit court.

¶ 9    The circuit court further explained to the defendant that he would be required to adhere to the rules of evidence at trial and the attorneys that were appointed to represent him had substantial training and experience in trial procedure. The circuit court cautioned the defendant that the State was represented by experienced attorneys, and the defendant would be at a disadvantage representing himself without any trial experience. The defendant was warned that he may be disadvantaged by failing to object to inadmissible evidence and his tactical decisions may have

3

unintended consequences due to his inexperience. The circuit court additionally cautioned the defendant that the jury would be able to observe his interactions with the circuit court and witnesses, and that the defendant's conduct, attitude, and temperament could affect the judgment of the trier of fact.

¶ 10    The circuit court found that the defendant understood the nature of the charges and the possible penalties. The defendant was informed of his right to counsel, and if he were unable to afford an attorney, one would be appointed for him. The circuit court found that the defendant understood his right to counsel, and that the defendant made a voluntary, knowing, and intelligent waiver of his right to counsel. As the defendant's request for waiver of counsel was accepted by the circuit court, his public defender was discharged.

¶ 11    On February 8, 2023, the defendant requested the appointment of counsel. The circuit court granted his request and appointed a public defender. Before defense counsel met with the defendant, the grand jury returned an amended indictment on February 9, 2023, on the same charges. The only modification made was on the unlawful possession of weapons by a felon count which corrected the date of a prior conviction.

¶ 12    The defendant thereafter met with defense counsel, who then filed a motion to withdraw asserting that the defendant wished to proceed *pro se.* On February 23, 2023, the circuit court held a hearing on the motion to withdraw. Defense counsel explained that he had met with the defendant for approximately two hours, and the defendant indicated that he wished to represent himself. The circuit court addressed the defendant and the following transpired:

> "THE COURT: All right. We've gone through all of the admonishments extensively previously. I don't think I need to do it again. You understand, I think you very much understand, your right to counsel; what your options are. I think you very much understand the charges, the gravity of the charges, the possible sentences for the charges. So you're not under the influence of anything today; are you?

DEFENDANT: No, [Y]our Honor.

THE COURT: You've given this some thought? Evidently you expressed this to Mr. Fuller on the 21st. It's now the 23rd. So you've been thinking about this, I assume, for some time?

DEFENDANT: That's correct. Yes, [Y]our Honor.

THE COURT: All right. I'm going to find that you're, once again, representing yourself, Mr. Foster. I think you've made a knowing and voluntary waiver of your rights again. So you're back to representing yourself."

¶ 13 A pretrial hearing was held on March 14, 2023, during which the circuit court addressed the State's use of the defendant's videotaped interview with law enforcement. The State informed the circuit court that several redactions had been made to the video where the defendant had referenced federal probation, or a probation officer, prison time, and charges in other cases. The defendant objected to the State playing the edited version of the video in its entirety and argued that the video was not relevant as no admissions were made during the interrogation. The defendant further argued that the State was attempting to introduce character evidence, which was irrelevant. The circuit court took the defendant's objection under advisement and reviewed the redacted video.

¶ 14 The next day, the circuit court held another hearing to address the admissibility of the redacted video recording of the defendant's interview with law enforcement. The defendant had not had an opportunity to review the latest redacted version, but again objected to the State playing the entire video which contained hearsay, references to prior convictions, and irrelevant statements. The circuit court overruled the defendant's hearsay and relevancy objections but allowed the defendant to review the newly redacted video to determine if it improperly referenced other prior criminal acts. The circuit court ultimately overruled the defendant's objections and

5

allowed the State to introduce a redacted video, over two hours in duration, of the defendant's interview with law enforcement.

¶ 15                                    *Jury Trial*

¶ 16    A multiple day jury trial began on March 21, 2023. After the jury was selected and the parties presented opening statements, the State introduced testimony from the three individuals who suffered injuries during the September 8, 2021, shooting.

¶ 17    Jackie Sharp, Troy Jones, and Charles Thompson each testified that they were not familiar with the defendant, and none of them saw the shooter. All three victims required hospitalization due to their gunshot wounds and were all flown by helicopter for medical treatment in St. Louis, Missouri, on the night of the shooting.

¶ 18    Jackie also testified to the events that occurred before the shooting on the evening of September 8, 2021. She and some friends were together outside at Oakwood Estates. Ken was there also and began an argument by commenting on Danyelle's car. Darylann borrowed Danyelle's cell phone to find people who would "beat up Ken." A man wearing red arrived with a "man purse." He had a gun and confronted Ken. Charles, a friend of Ken, also appeared, "flying in like a bat out of hell." Jackie testified that Charles had a gun in his waistband. The police were called and made people move after they arrived. The man in red walked off after the police tried to disperse the group. A video of the altercation was admitted into evidence and played for the jury.

¶ 19    Jackie additionally testified that everything calmed down, and eventually people gathered and started talking again. Then, gunshots "erupted." Troy, Jackie, and Charles fell to the ground after they were shot. Jackie indicated that the shots came from the "dark side of the building." She could not see the face of the shooter but did testify that he had on a hoodie and was wearing all

6

black. Charles gave his gun to Ken, and Ken fired the weapon in the wrong direction. Two surveillance videos of the shooting incident were played for the jury, and were used by Jackie to identify the scene. Jackie could not identify the shooter and when asked if she knew the defendant, she did not.

¶ 20    Ken testified that on September 8, 2021, he was intoxicated and had been involved in an argument. Ken mocked Danyelle's damaged car, which upset her. Darylann threatened Ken and called her boyfriend to "come do something to me." Her boyfriend appeared and began arguing with Ken and several other people. Darylann's boyfriend then pulled a gun out of a pouch and yelled. The fight calmed down after Darylann walked away with her boyfriend.

¶ 21    Ken testified that everything had calmed down for a little while, but then more verbal arguments started. Darylann returned but she walked away from where everyone was standing. Then, the shooting started. Ken's nephew, Charles, threw his firearm towards Ken. Ken testified that he fired back in self-defense. When police officer interviewed Ken, he gave them the firearm that he had used. Ken believed that there were two shooters, but he could not identify anyone because he had ducked down.

¶ 22    Darylann testified that the defendant was her boyfriend and she identified the defendant in the courtroom. Darylann lived in Oakwood Estates. On September 8, 2021, Ken was intoxicated, and he tried to hit Darylann and Danyelle with a liquor bottle. Darylann testified that she had called the defendant from Danyelle's phone, using the Facebook Messenger application. The defendant used the name "S DOT RU" on Facebook.

¶ 23    The defendant arrived wearing a red shirt and he had a bag. Darylann testified that she never saw the defendant reach into the bag or pull anything out of the bag. The argument ended when the police made everyone leave. The defendant walked Darylann to her house. He told her

7

to go inside and he left. The defendant then called Danyelle's phone because he thought some items had fallen out of his bag earlier. Darylann remained on the phone with the defendant as she went back to pick up the items, and Ken approached her again to accuse her of calling the police. The defendant, who was still on the phone with Darylann, told her to go to Danyelle's house. Darylann testified that she was still on the phone with the defendant inside of Danyelle's apartment when she heard gunshots. She hung up the phone and called 911.

¶ 24    Darylann testified that when the police questioned her about her boyfriend, she provided the police with a false name. Darylann additionally testified that she remained in a relationship with the defendant.

¶ 25    Shirlene Jones testified that she worked for the Alton Housing Authority. On September 8, 2021, people were arguing over parking spots, and Shirlene wanted to break up the argument. Shirlene noticed that Darylann was making phone calls. Then, a male, "medium skinned, about 5'6 maybe, about 200, beard" arrived wearing shorts and a red t-shirt. He began arguing with Charles. Darylann handed a bag to the man, and Shirlene noticed the "butt" of a gun sticking out of the bag. The man in red said that he "wasn't scared of nobody and that he will shoot up the place and stuff." Darylann and the man walked away when the police appeared. The police directed people to move their double parked cars. Shirlene remained outside and was looking at her phone when she heard the gunshots. Shirlene saw a person in all black that she believed to be the shooter, run behind houses.

¶ 26    Terrea Gates, the defendant's cousin, testified that the State agreed to dismiss two charges against her and allow her to plead guilty to a misdemeanor in exchange for her testimony. On September 8, 2021, Terrea was with her husband, Lajuane Robinson, in Oakwood Estates, and she saw the defendant walk by. A few minutes later, she heard a commotion down the street and found

8

that a "whole bunch of people" were yelling at the defendant. Darylann had the defendant by his arm. Terrea grabbed the defendant and walked him towards Terrea's car. Lajuane drove the defendant to a house on College Avenue. The defendant went into the residence and spent about five minutes. He returned to the car and asked for a ride back to Oakwood Estates.

¶ 27 Terrea did not look at the defendant when he returned to the car and was not aware if the defendant had changed clothes or if he was carrying anything. The defendant sat in the back seat of the car, and they dropped him back off on Toledo Avenue near Oakwood Estates. After dropping the defendant off, Lajuane and Terrea went to a nearby convenience store. The defendant then sent Terrea a text message that he had left his backpack in the car. The defendant met Terrea at Belle Manor that evening and she returned his bag.

¶ 28 Terrea also testified that she was interviewed by law enforcement on September 13, 2021. She was not truthful with law enforcement at that time because she was afraid of being implicated in a crime and wanted to protect the defendant. Terrea denied giving the defendant a ride but testified that she told the truth in the second interview on March 9, 2022.

¶ 29 On cross-examination, Terrea testified that on March 9, 2022, she was being held on pending charges regarding a firearm. Law enforcement went to Terrea's house to speak to her about the defendant and found a firearm at that time. Terrea's second interview was substantially the same as the testimony she gave at trial.

¶ 30 Lajuane Robinson testified that he was in custody on two different felony charges. Lajuane agreed to plead guilty in both pending cases. He accepted a three-year sentence for one case, and a sentence of 24 months in the other, in exchange for testifying.

¶ 31 Lajuane testified that on September 8, 2021, he was with his wife, Terrea, at Oakwood Estates, to purchase marijuana from the defendant. The defendant had walked by their car and

9

Terrea called the defendant's name. The defendant did not stop and was headed down the street. There was "some commotion" in the direction that the defendant was headed. Lajuane was on parole at that time and did not want to be involved in a fight. Terrea went to check on the defendant, and she returned with the defendant and Darylann. Darylann left and Lajuane drove the defendant to a house on College Avenue. The defendant directed him to a residence there. The defendant spent about five minutes in the house and returned to the backseat of Lajuane's car. The defendant asked for a ride back to Oakwood Estates and Lajuane dropped the defendant off on Toledo Avenue, which was nearby. Lajuane then drove to a gas station and was there when he heard gunshots. Lajuane also testified that the defendant left a bag in the back seat of the car, which Terrea returned to the defendant that evening. Lajuane testified that he was not honest with law enforcement during his first interview because he did not want to be implicated in a crime. When he was interviewed again on February 24, 2022, he told the truth.

¶ 32    On cross-examination, Lajuane testified that he never saw the defendant with a firearm. Lajuane did not see the defendant wearing all black clothing.

¶ 33    Shaquitta Watkins testified that she was the defendant's friend. On September 8, 2021, she went to a Cardinals baseball game with the defendant and the defendant's son. The defendant was wearing a red hat and a red shirt. After the baseball game, Shaquitta dropped the defendant off at Oakwood Estates and drove the defendant's son to pick up a change of clothes. She also picked up her daughter. On her way back home, she saw a squad car with flashing lights heading towards Oakwood Estates, and she called the defendant. He did not answer, but he did return her call. The defendant asked Shaquitta to pick up him, and he sounded "like he was rushing." Shaquitta testified that she picked up the defendant on Toledo Avenue.

¶ 34    When Shaquitta picked up the defendant, he was wearing a dark hoodie. The defendant took his shirt off and Shaquitta believed that she saw the defendant wrap his shirt around something. Shaquitta drove the defendant to Belle Manor to pick up his bag. They then drove to Shaquitta's house to drop off her daughter, and on the way, the defendant directed Shaquitta to stop the car. He threw his sweatshirt in the bushes. Shaquitta drove to the defendant's place on Ervay Avenue after dropping off her daughter, but they subsequently ended up staying at a house on College Avenue.

¶ 35    While they were driving, Shaquitta heard the defendant tell someone over the phone that he was not at Oakwood Estates. That evening, the defendant asked Shaquitta to get rid of his phone. Shaquitta later turned the defendant's phone over to the police. Photographs of a phone that Shaquitta identified as the defendant's phone were admitted into evidence.

¶ 36    During cross-examination, Shaquitta testified that she never saw the defendant with a firearm. She would have noticed if the defendant had been carrying a large weapon. She also testified that the defendant had a calm demeanor that evening.

¶ 37    Sergeant Joseph Splittorff, an Alton Police Department investigator, indicated his participation in the September 8, 2021, shooting included the review of the defendant's Facebook page, information downloaded from Shaquitta Watkins's cell phone, and information from Danyelle's cell phone. Splittorff testified that the defendant's Facebook name was "S DOT RU," and that the defendant deactivated his Facebook page on September 11, 2021.

¶ 38    Splittorff described, in detail, the timing of the Facebook communications between the defendant and Darylann that took place through Danyelle's Facebook Messenger account. The defendant objected to Splittorff testifying using Facebook data as Splittorff was not identified as an expert witness and the circuit court directed the State to lay a foundation. Splittorff then testified

11

that he had training through his experience in investigations in "open source intelligence gathering," He had attended formal trainings, and had viewed thousands of pieces of intelligence data and social media data and was able to observe "the way these are recorded." Splittorff again testified to the timing of the calls made and the defendant raised a general objection that was overruled. Splittorff continued to testify to the timing of various calls that occurred between Danyelle and the defendant, including an outgoing call from Danyelle to the defendant that ended at 11:17 p.m. Splittorff testified that the shooting had taken place at 11:18:55 based on the surveillance video footage. The defendant objected that Splittorff's testimony was hearsay and the circuit court overruled the objection.

¶ 39    Splittorff additionally explained that the last call recorded, according to the data, ended a minute and a half prior to the shooting. The next missed call through Facebook was made from the defendant's Facebook account to Danyelle's account at 11:20 p.m. Splittorff concluded that the defendant was not on the phone at the time when the shooting occurred.

¶ 40    On cross-examination, Splittorff testified that the timestamps on the video surveillance from Oakwood Estates were off by 2 minutes and 34 seconds and clarified that the shooting actually began at 11:18 and 55 seconds. Splittorff additionally explained that audio calls from Facebook Messenger displayed the time the calls ended. The following transpired when the defendant inquired:

"Q. And you stated you are an expert when it comes to how Facebook Messenger calls work?

A. I'm not sure that I would qualify myself as an expert. I just have significant training, and I've had significant experience analyzing those type of records."

12

The defendant then questioned Splittorff regarding when he discovered that the timestamp on the Oakwood Estates surveillance video was incorrect, and Splittorff responded "very early in the investigation." The defendant questioned if Splittorff had notified the State of the discrepancy, and the State requested a side bar.

¶ 41    After the jury and witness left the courtroom, the defendant claimed that he was unaware that the surveillance video timestamp was off. The State informed the circuit court that it provided discovery to the defendant that indicated the time disparity on the surveillance video, and that the defendant had received that information in discovery.

¶ 42    The circuit court resumed testimony without any formal ruling, and Splittorff testified that he was not the person who discovered the inaccuracy of the video timestamps. He was unaware of whether the timestamps in the investigative report were based on the video timestamp or the correct time of day. Splittorff had not drafted the investigative report.

¶ 43    Splittorff was later recalled by the State to testify that he collected video surveillance footage from Sanders Waste, a property near the south end of the Oakwood Estates. Splittorff explained that Toledo Avenue was a main thoroughfare that people commonly used to travel to and from Oakwood Estates. Video footage obtained from Sanders Waste depicted Lajuane and Terrea dropping the defendant off on Toledo Avenue. The defendant arrived on Toledo Avenue at 11:06 p.m. and was picked up at 11:24 p.m. The shooting took place at 11:18 p.m.

¶ 44    Thomas Gamboe testified as an expert witness in the field of firearm and tool marks. Gamboe identified the four fired cartridge casings from the Taurus 9-millimeter PTG2 Ken had turned over to law enforcement. He testified that no shell casings were recovered from the area where the shooter was located. Gamboe indicated that a shotgun with buckshot ammunition, that had multiple projectiles, could have caused numerous gunshot wounds to the three victims in this

13

case. Gamboe opined further that it was possible for the shooter to use a type of shotgun that was capable of firing 12 times without discharging a cartridge case.

¶ 45    Detective Partick Bennett testified that he was a detective with the Alton Police Department in the criminal investigation division. Bennett conducted the law enforcement interview of the defendant that was captured on video. Bennett indicated that every time the defendant provided an answer inconsistent with the evidence, he would take a drink of coffee or put the coffee up to his mouth, even after the cup was empty. The defendant would also look at the camera when he provided inconsistent statements. The 2-hour-and-17-minute video of the defendant's interrogation was admitted into evidence and published for the jury, over the defendant's objection.

¶ 46    The interrogation began with Bennett handing the defendant a cup of coffee as Bennett and another detective entered the interview room. Bennett started the interview by informing the defendant that they had been working on the case for a couple weeks, and they had spoken to multiple people and reviewed multiple surveillance videos from the area of the shooting. Bennett asked the defendant general demographic questions. The defendant indicated that he had been kicked out of school and attended a military academy. Thereafter, Bennett gave the defendant *Miranda*[1] warnings.

¶ 47    The majority of the defendant's interview focused on the evening of September 8, 2021. The defendant stated that he had attended a baseball game and was dropped off by Shaquitta at Oakwood Estates after the game. The defendant provided an animated explanation of what occurred at Oakwood Estates after he arrived. He stood up in the interview room to reenact his interaction with Charles, who he did not know at that time. Charles had pulled a gun on the defendant. The defendant explained that Shaquitta was supposed to drive him home after the

---

[1]See *Miranda v. Arizona*, 384 U.S. 436 (1966).

defendant checked on Darylann. Terrea was at Oakwood Estates, and Terrea and her husband gave the defendant a ride home. The defendant first claimed that he was at home showering when the shooting occurred.

¶ 48 Bennett responded that he believed Shaquitta had given the defendant a ride after the shooting and that he was 100% certain that the defendant was at Oakwood Estates during the shooting. The defendant explained that he left his cross-body bag in Terrea's car and Shaquitta retrieved the defendant's bag from Belle Manor. Bennett responded that "everyone and their mother" said that the defendant was with Shaquitta to pick up the bag. The defendant also denied going to College Avenue on the night of the shooting.

¶ 49 The defendant further denied having a gun in his bag when Charles pulled out his gun. Bennett claimed that the defendant had a gun and was persuaded not to use it. Bennett stated he had extensively reviewed the video and, "you know that we have the right suspect." The defendant continued to deny that he had a gun in his bag, and that, "I don't have a f*** gun on me, n*** pull a f*** gun on me, I have the right to blow his f*** head off." Bennett stated if that had happened, the defendant would have acted in self-defense, but the defendant's action of coming back later was no longer self-defense.

¶ 50 The interrogation proceeded with Bennett then discussing that he had interviewed the defendant's son who at first tried to cover for the defendant. The defendant's son then told law enforcement that a shooting occurred, and the defendant was picked up from Oakwood Estates. The defendant claimed that his son was not telling the truth. Bennett then commented that "when you see the discovery, your mind is going to blow because everyone else's story matches to a tee, except for yours." Bennett also stated that he received an arrest warrant for three counts of attempted murder where he had to take evidence to a prosecutor and show that this occurred to get

the warrant. The defendant continued to deny that his son picked him up from Oakwood Estates. Bennett countered that Shaquitta picked the defendant up from Oakwood a second time and the defendant put his hand up to his mouth. Bennett then laughed and stated that, "you get all nervous whenever I say something." Bennett then stated that three people were shot and could have died and that it was not a joke. He further commented that the defendant was "lying about the small things that makes you do, zero credibility."

¶ 51    Bennett questioned the defendant on whether he had a phone with him on the night of the shooting. The defendant explained that he gave his phone away and that he had been charged with crimes in the past. The defendant claimed that he got rid of his clothes that night because he was told to, but he did not discard everything. He kept his shoes and the clothes he wore to the Cardinals' baseball game. He also claimed that he did not remember what he was wearing on September 8. Bennett insinuated during the interview that the defendant's DNA would be found on an item shown in a photograph that was not clearly visible in the video.

¶ 52    The defendant claimed that everyone lied but he knew what he did. Bennett responded that he had "multiple people telling stories that were corroborated by overwhelming evidence, *i.e.*, videos and other people's statements and the physical evidence and the things like that." The defendant stated that they did not know what happened that night and mentioned stories that he heard from that night and no one knew what happened on September 8, 2021. Bennett commented that "if I were in your spot, I would not want to sit in front of 12 jurors."

¶ 53    Bennett took a break and left the room. When Bennett returned, he handed the defendant a fresh cup of coffee. He told the defendant that he had reviewed a video and witness statements during the break, and there was "no doubt" that the defendant went back out to Oakwood Estates. He asked the defendant to explain why he returned to Oakwood Estates to understand the

16

defendant's mindset. Bennett asked how the defendant would respond to a video showing him at Oakwood Estates that night and asked about a video of Shaquitta returning to Oakwood Estates to pick someone up. The defendant denied that Shaquitta picked him up from Oakwood Estates. Bennett responded, "I'm telling you that's what she did, to come pick you up, is why she came back to Oakwood." The defendant denied that a shooting occurred while he was at Oakwood Estates.

¶ 54 Bennett questioned the defendant further about getting rid of his phone. Bennett stated that, "it seems like you took a lot of drastic steps to avoid detection by the police for something you didn't do." Bennett asked why the defendant gave Shaquitta his iPhone and "told her to get rid of it," and he told the defendant that his iPhone was in the evidence locker. Bennett showed the defendant a photograph of a phone, claiming it was the defendant's phone. Bennett then told the defendant that his location history was on the cell phone and asked the defendant to respond to the cell phone data showing that he was in Oakwood Estates for a second time, during the shooting. The defendant indicated that his phone would show that Terrea took the defendant home and he was at home during the time of the shooting. Bennett countered that Terrea took him to College Avenue and that defendant needed to "start processing this in your head and know that we have this whole thing pieced together on camera." During the interview, the defendant mentioned that he knew where the surveillance cameras were located at Oakwood Estates.

¶ 55 Bennett additionally made comments theorizing the defendant's motive. Bennett stated that the defendant had returned because he "got a gun pulled on" him. Bennett believed that the defendant went back to Oakwood Estates because he was "not going to be f*** disrespected like that, which is totally f*** understandable, I get that. I'd be f*** pissed. Somebody's f*** with your girl, mother*** are pulling gun on you, you don't have a chance to react right then and there."

17

Bennett additionally stated that people will assume that when he gets "picked up by his girlfriend right f*** 100 yards from the f*** Oakwood, yes, they're going to assume that, that's why I'm going to assume that. Because your girlfriend and your f*** child pick you up." The defendant maintained that Shaquitta was lying. Bennett then asked for the defendant's explanation of why he went back out to Oakwood and that the defendant can "roll the m*** dice" on whether people believe his story over the witnesses. During this exchange, the defendant was drinking the coffee that Bennett refilled during the break.

¶ 56    At the end of the interview, Bennett and the defendant discussed whether it would have been acceptable for the defendant to shoot someone if a gun was pulled on him. The defendant claimed that he did not understand why someone pulled a gun on him, and he would have "shot the f*** out of him" if he had a gun on him at that time. Bennett suggested that the defendant went to get a gun and came back. Bennett asked the defendant if he thought that the man who pulled his gun on the defendant "deserved to get shot." The defendant referred to the shooting as "karma" and that the man knew that he deserved it. He added that people should not play around with guns or put their hands on a woman. The defendant also stated that "I used to punch dudes in the f*** face just because I used to be gangster." He also said that he was "totally against" pulling a gun on someone. Bennett stated that the issue was that "he did not shoot him right then and there." The defendant maintained that he never shot anyone.

¶ 57    After the defendant's video interview was played for the jury, Bennett testified by highlighting multiple statements that the defendant made during the interview. Bennett testified that the defendant had shut down his Facebook Messenger account after the shooting; after the fight in Oakwood, the defendant left with Terrea and Lajuane; and the defendant claimed that they dropped him off on Ervay Street in Alton, Illinois. Bennett indicated that the defendant gave

18

inconsistent statements about picking up a bag from Terrea at Belle Manor because he had claimed that he picked up the bag and later stated that someone else picked up the bag for him. The defendant also gave inconsistent answers regarding whether he went to a house on College Avenue on September 8, and he went back and forth on whether he discarded his clothing from the night of the shooting. Bennett additionally noted that the defendant said he knew where the cameras were located in Oakwood Estates, and that the people deserved to be shot "if they pulled out a gun, or something to that affect."

¶ 58    On cross-examination, Bennett testified that he had not seen the defendant on video in Oakwood Estates after the defendant left with Terrea. Bennett testified that there was no DNA found on the sweatshirt that was recovered. Bennett acknowledged that Terrea and Lajuane had not told the entire truth during their interviews prior to the defendant's interview.

¶ 59    Daniel Vassar testified that he lived on College Avenue with Jonathan Lucas and he knew the defendant. The defendant kept personal items at the house on College Avenue. Vassar was not home on the evening of September 8, 2021; he was in St. Louis, Missouri, with Lucas. Vassar testified that the defendant called him on September 8, 2021, and asked to speak to Lucas. Vassar testified that he heard the defendant tell Lucas, "that there was an altercation in Oakwood and that the defendant had left and came back and shot some people." The defendant told Lucas that the defendant had placed the gun inside the house on College Avenue, and Lucas told the defendant to get it. Vassar testified that they did not want the gun at their residence. Vassar additionally testified that on September 13, 2021, he told law enforcement about this conversation.

¶ 60    Brian Hapack testified that he was a forensic biologist and employed by the Illinois State Police in the crime lab. Hapack attempted to extract a DNA profile from a dark-colored hooded sweatshirt. However, there was "very little information in the mixture of DNA profile" and he was

19

unable to make any determinations as to whether a specific person had worn the hooded sweatshirt. On cross-examination, Hapack testified that it was possible that a woman had worn the hooded sweatshirt as he was unable to make any determinations.

¶ 61   Detective Bennett was recalled as a witness by the State. He testified that he had observed that the timestamp on the surveillance footage from Oakwood Estates was 2 minutes and 34 seconds behind the actual time. The defendant's initial arrival time of 10:49 p.m. at Oakwood Estates was captured by the surveillance camera. An LPR camera in front of Oakwood Estates captured the license plate of a vehicle which dropped off the defendant, and that vehicle was owned by Shaquitta. At approximately 10:50 p.m., the defendant was involved in a verbal argument, and the video footage depicted the defendant "grabbing in a bag." The defendant left Oakwood Housing Complex at approximately 10:54 p.m. with Terrea. The LPR system was unable to capture the license plates of the vehicle that Terrea and the defendant got into. Based on the surveillance video, Bennett believed that Terrea dropped the defendant off on Toledo Avenue at 11:06 p.m. as the surveillance video had captured a dark figure walking after Terrea returned to Oakwood Estates. Bennett additionally identified the muzzle flash from the shooting on the surveillance video and concluded that the shooting occurred at 11:18 p.m.

¶ 62   Bennett testified that he had obtained a search warrant for the defendant's phone records. A certificate of authenticity was attached to the AT&T phone records. The certificate referred to the Federal Rules of Evidence, not Illinois law, and the certificate did not contain language that the certification was signed under oath. The AT&T records were admitted without objection.

¶ 63   The State questioned Bennett on multiple phone calls using those AT&T records. Bennett testified that the defendant had called Shaquitta Watkins before he was dropped off in Oakwood Estates. A few minutes after the shooting, the defendant made an outgoing call to Terrea, followed

20

by a call to Shaquitta. Bennett testified that Shaquitta picked the defendant up from behind Oakwood, shortly after he called her, and there was a video of her vehicle at Oakwood. Bennett further testified that the defendant had claimed that he was at home on Ervay Street when the phone calls were made. Bennett had provided the phone records to an expert in digital forensics to extract location data from the phone calls.

¶ 64    Tim Lawrence testified that he was a detective sergeant with the Madison County Sheriff's Office. Lawrence's *curriculum vitae* was admitted into evidence, and he was qualified as an expert in the area of historical cell site analysis. Lawrence drafted a report that included multiple maps based on the AT&T data provided by Bennett. The maps highlighted a general area of where the defendant's cell phone could have been located based on the cell tower information. The AT&T data placed the defendant in downtown St. Louis on September 8, 2021, hours before the shooting. Then, the defendant travelled to the Alton, Illinois, area where he remained from 10:41 p.m. until 1:12 a.m. on September 9, 2021, which was the time of the last data point that Lawrence received. Lawrence's report was admitted into evidence over the defendant's objection.

¶ 65    Based on the cell tower information obtained from the time when calls were placed, Lawrence testified to specific places where the defendant could have been located and when the defendant changed locations. The defendant objected to Lawrence's testimony regarding the defendant's location, which the circuit court overruled. Lawrence additionally explained that the AT&T phone records only included calls where the device connected to a cell phone tower. Calls made through Facebook Messenger were not included in the phone records. Specifically, the defendant's location was not determined during the 11:14 p.m., 11:15 p.m., or 11:17 p.m. time periods, as Facebook calls would not have connected to an AT&T cell phone tower. Lawrence

21

further testified that it was not possible for the defendant's cell phone to have remained on Ervay Street all night because the records demonstrated that the device had moved around the cell tower.

¶ 66 On cross-examination, Lawrence testified that he was unaware of how many cell phone towers were located in Alton, Illinois. Lawrence could not determine whether a cell phone was moving based on the AT&T data and he was unable to use the data to determine the exact location of the defendant's cell phone. Lawrence agreed that the defendant's cell phone could have been located within "a million different places" within the shaded area on the maps created using the AT&T data. Lawrence explained that a cell phone could connect to a tower in an area greater than 5 miles, although it would be "very rare" to connect outside of 10 miles. Additionally, a cell phone connects to a tower based on signal strength. He also indicated it was possible that a person could connect to the opposite side of a tower, but it was highly unlikely.

¶ 67 The State rested after Lawrence's testimony concluded. The defendant then moved for a directed verdict and argued that the State failed to prove every element of the offense. He claimed that the evidence was inadequate where there were no eyewitnesses or physical evidence which connected the defendant to the crimes. The circuit court denied the defendant's motion.

¶ 68 The defendant recalled Detective Bennett who testified that he interviewed Terrea twice. She provided inconsistent statements. Bennett also interviewed Shaquitta for five hours, and several other individuals. Bennett had attempted to obtain security footage from the residence on College Avenue but was unable to view the password protected video surveillance from that residence.

¶ 69 Anthony Glen testified that he lived in Oakwood Estates. On the evening of September 8, 2021, he was at home and asleep. Glen's wife woke him to tell him about the shooting. Glen saw emergency vehicle lights from his kitchen window and went outside. Someone identified Glen as

22

the shooter and a police officer detained Glen for approximately 40 minutes. The next morning, Glen found a bullet hole in his kitchen window.

¶ 70    Howard Jones testified that he was in a relationship with Jackie and Ken was his younger brother. On September 8, 2021, Howard was sitting in his car. Ken was arguing with Darylann and Danyelle. The police arrived and made Howard move his car. After he moved his car to an area close by, he heard gunshots. Howard saw people picking up shell casings that looked like rifle shell casings. He did not know the people, but they appeared to be male.

¶ 71    Ken was recalled as a witness and questioned regarding his prior testimony that he saw the defendant reach into a bag and display a firearm. A video of the interaction was shown to Ken, and he was asked when the defendant had pulled out a firearm. Ken then stated that he may not have seen the defendant display a firearm. On cross-examination by the State, Ken testified that even though he did not see it on the video, that did not mean that it did not occur. Ken additionally testified that he was intoxicated on September 8, 2021.

¶ 72    The defendant testified on his own behalf. The defendant stated that, on September 8, 2021, he had been home with his son and Shaquitta when he received a Facebook Messenger video call from Danyelle's phone, but it was Darylann. She told the defendant that she was in Oakwood Estates and someone tried to hit her with a bottle. The defendant asked Shaquitta for a ride to Oakwood. When she dropped him off, he walked to the cul-de-sac area and found Darylann. She pointed out the man who was antagonizing her. The defendant realized that there were others around him and he was outnumbered. He did not want the situation to escalate to gun violence as he had been shot 10 times in a prior incident at Oakwood Estates.

¶ 73    The defendant testified that he attempted to convince Darylann to leave after he saw someone pull out a gun. Terrea then grabbed the defendant's arm and he left with Terrea, as he

23

told Darylann to go into a nearby house. The defendant explained that he and Darylann were not on good terms that night as they had been in a terrible argument the night before. The defendant testified that he was irritated with her because she had blown his whole night. The defendant asked Lajuane to drive him to College Avenue because he wanted to get a key and find Lucas, who was not home at the time. After going to the residence, Lajuane then dropped the defendant off a couple of blocks from College, which is in the vicinity of Oakwood Estates, because he did not want Lajuane to know where he was staying. The defendant denied ever returning to Oakwood. He later asked Shaquitta to pick him up, and while he was with her, he was on the phone with Darylann, who reported the shooting.

¶ 74    The defendant insisted that Darylann called again from Danyelle's phone and told the defendant that the person was still "messing" with her. The defendant asked Darylann to go outside to see if he left his bag because he did not know where it was. The defendant indicated it had personal items in it. While he was on the phone with her, she told the defendant that someone was shooting at her. The defendant claimed that he did not hear any gunshots. The defendant additionally testified that he did not know the victims in the shooting.

¶ 75    The defendant also tried on the sweatshirt collected in evidence. He claimed it was a "girl's sweatshirt," and it was too small for him. The defendant stated, "I'm surprised I can get in it at all." After the defendant rested, the parties presented closing arguments.

¶ 76    The jury was given instructions for the attempt murder charge that included language "that the defendant performed an act which constituted a substantial step toward the killing of an individual" or "that the defendant did so with the intent to kill an individual." The names of the victims were not included in the jury instructions.

¶ 77    The jury found the defendant guilty of three counts of attempt first degree murder, three counts of aggravated battery with a firearm, and guilty of aggravated discharge of a firearm. The jury additionally found that during the commission of each of the three attempt first degree murders, the defendant personally discharged a firearm that proximately caused great bodily harm.

¶ 78    On April 17, 2023, the defendant filed a series of *pro se* motions requesting a new trial. He additionally requested the appointment of counsel to assist posttrial, prior to sentencing. The circuit court appointed counsel to represent the defendant.

¶ 79                              *Posttrial Motions*

¶ 80    Defense counsel filed a posttrial motion on August 14, 2023, and incorporated the defendant's *pro se* posttrial filings. The motions raised arguments the defendant was not properly admonished when he waived his right to counsel, alleged evidentiary errors at trial, speedy trial violations, and claims of State misconduct during *voir dire*, closing arguments, and throughout the trial. The circuit court held a hearing on the posttrial motions and denied each motion.

¶ 81                                  *Sentencing*

¶ 82    During the sentencing hearing, the defendant did not argue factors in mitigation. He claimed that he was innocent of the offenses, was wrongfully convicted, and that arguing factors in mitigation would be an acknowledgment of guilt. The defendant made a statement in allocution where he stated that he was against violent crimes, that he was sorry for what had happened to the victims, and he maintained his innocence.

¶ 83    The State argued that the defendant's conduct caused or threatened serious harm when he opened fire into a crowded area. The defendant had a criminal history which included two felonies related to the manufacturing or delivering of cocaine, and a misdemeanor for disorderly conduct and resisting arrest.

¶ 84    The State suggested that the minimum sentence that the defendant faced was 93 years in the IDOC and requested a sentence in excess of 100 years. The defendant argued that he should receive the minimum sentence on two attempt first degree murder counts of 31 years each.

¶ 85    The circuit court found that the defendant was required to be sentenced on three counts of attempt first degree murder. The circuit court additionally found that the defendant committed a "very horrific, violent act," he had a significant criminal history, and that he was on supervised release at the time of the offense.

¶ 86    The defendant faced sentences of 6 to 30 years on each of the attempt first degree murder charges. The circuit court sentenced the defendant to 20 years with a 25-year firearm enhancement on each of the three counts, to be served consecutively, for a total of 135 years in the IDOC. The remaining counts merged with the three attempt first degree murder counts. This appeal followed.

¶ 87                                    II. ANALYSIS

¶ 88    On appeal, the defendant argues that the circuit court failed to properly admonish him prior to accepting his waiver of counsel; the jury instructions for attempt murder were improper as the State failed to provide notice of proceeding under a theory of transferred intent; the cumulative effect of errors deprived the defendant of his right to a fair trial; the defendant was deprived of a fair trial where the State engaged in pervasive prosecutorial misconduct during *voir dire*, closing arguments, and that the State had taken advantage of the defendant's *pro se* status; and his 135-year sentence is excessive.

¶ 89    We first address the issue that the *pro se* defendant failed to preserve multiple issues on appeal. "Where a defendant elects to proceed *pro se*, he is responsible for his representation and is held to the same standards as any attorney." *People v. Richardson*, 2011 IL App (4th) 100358,

26

¶ 12. In order to preserve an error for review, a criminal defendant must raise an issue at trial and in a posttrial motion. *People v. Salamon*, 2022 IL 125722, ¶ 56.

¶ 90 The defendant has sought plain error review on those issues which were not preserved. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We reiterate that the initial step in determining whether plain error applies is determining whether a "clear or obvious error" occurred at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 91                    A. Waiver of Counsel

¶ 92 The sixth amendment to the United Stated Constitution (U.S. Const., amend.VI) guarantees a defendant the right to the assistance of counsel in a criminal proceeding. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). The right to counsel may be waived, if the waiver is "voluntary, knowing, and intelligent." *Jiles*, 364 Ill. App. 3d at 328. Pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984),

> "The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>           (1) the nature of the charge;
>           (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>           (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."

27

¶ 93    "Strict, technical compliance with Rule 401(a) is not always required; rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was otherwise made knowingly, intelligently, and voluntarily, and the admonishments the defendant received did not prejudice his rights." *Jiles*, 364 Ill. App. 3d at 329. "Substantial compliance occurs when any failure to fully provide admonishments does not prejudice defendant because either: (1) the absence of a detail from the admonishments did not impede defendant from giving a knowing and intelligent waiver or (2) defendant possessed a degree of knowledge or sophistication that excused the lack of admonition." *People v. Pike*, 2016 IL App (1st) 122626, ¶ 112. "The interpretation of a supreme court rule is a question of law that we review *de novo.*" *People v. Campbell*, 224 Ill. 2d 80, 84 (2006).

¶ 94    When advising the defendant on the nature of charge against him and the consequences, the circuit court is not required to state all facts which may or may not constitute the offense. *Pike*, 2016 IL App (1st) 122626, ¶ 117. In *Pike*, the defendant was informed that the nature of the charges was "armed robbery with a firearm" and "attempted residential burglary," which was sufficient. *Pike*, 2016 IL App (1st) 122626, ¶ 118.

¶ 95    The defendant seeks plain error review on this issue. The right to counsel is fundamental and will not lightly be deemed waived. *Jiles*, 364 Ill. App. 3d at 328. Plain error review applies to whether the defendant was denied this substantial right. *Jiles*, 364 Ill. App. 3d at 328.

¶ 96    Here, the circuit court considered whether the defendant had waived his right to counsel on two occasions. During the hearing on the defendant's initial motion to proceed *pro se*, he was informed of the nature of the charges, the applicable sentencing ranges for each charge, and that he was facing consecutive sentences because there were three victims. The circuit court additionally explained the defendant's right to counsel. The defendant indicated that he understood

28

the admonishments. The record demonstrates that the circuit court thoroughly admonished the defendant during the September 29, 2022, hearing.

¶ 97 The defendant argues that the circuit court failed to substantially comply with Rule 401(a) the second time he waived his right to counsel. A reviewing court will look "to the overall context of the proceedings, including the defendant's conduct following the defendant's request to represent himself." (Internal quotation marks omitted.) *People v. Ware*, 407 Ill. App. 3d 315, 340 (2011). In deciding whether a defendant's waiver of counsel was valid, the dispositive issue is whether the waiver of counsel was made knowingly, understandingly, and effectively in light of the entire record. *People v. Gilkey*, 263 Ill. App. 3d 706, 711 (1994).

¶ 98 After several months of proceeding *pro se*, the defendant asked for the appointment of an attorney. Shortly after the defendant's request, a public defender was appointed and met with the defendant for over two hours. After one meeting, the defendant's counsel filed a motion to withdraw because the defendant wanted to proceed *pro se*. The circuit court considered that it had previously explained the admonishments to the defendant and found that the defendant understood his right to counsel, understood the gravity of the charges and the possible sentences for the charges. The circuit court also verified that the defendant was not under the influence of drugs or alcohol. The defendant further confirmed that he spent time considering his decision after meeting with his appointed attorney.

¶ 99 We consider the entirety of the record in determining whether the defendant was properly admonished and whether the circuit court substantially complied with Rule 401. See *Ware*, 407 Ill. App. at 347. We find that the defendant made a knowing, voluntary waiver of his right to counsel and there was no error. Because there was no error, we do not consider plain error.

¶ 100                          B. Jury Instructions

¶ 101   The defendant also argues that the State failed to provide notice of a transferred intent argument and the State's rebuttal argument addressing this theory conflicted with the jury instructions. The defendant essentially argues that the jury was provided with improper instructions for the charge of attempt murder. "Whether jury instructions fail to accurately reflect the applicable law is subject to *de novo* review." *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 60.

¶ 102   The defendant concedes that he did not preserve this error on appeal and seeks plain error review. "[F]or either prong of the doctrine to apply, there must have been some error in the first place." *Willingham*, 2020 IL App (1st) 162250, ¶ 60.

¶ 103   "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2024). In order for the State to obtain a conviction of attempt murder, a specific intent to kill must be proven beyond a reasonable doubt. *People v. Homes*, 274 Ill. App. 3d 612, 622 (1995). The intent to kill a particular person is not required. *Willingham*, 2020 IL App (1st) 162250, ¶ 68. The intent to kill can be demonstrated through the surrounding circumstances, such as the nature of the attack, the use of a lethal weapon, and the act of shooting at or near someone with either malicious intent or complete disregard for human life. *Homes*, 274 Ill. App. 3d at 622-23. "The requisite intent has routinely been found in cases where a defendant shoots someone while firing into a crowd, even if he or she was not aiming at the person who was shot." *Willingham*, 2020 IL App (1st) 162250, ¶ 68.

¶ 104   Illinois Pattern Jury Instructions (IPI) shall be used in criminal cases, unless the circuit court determines that the IPI Criminal instruction "does not accurately state the law." Ill. S. Ct. R.

30

451 (eff. Apr. 8, 2013). The attempt murder jury instruction generally does not specify the name of the victim. *Willingham*, 2020 IL App (1st) 162250, ¶ 63. Furthermore, "the IPI instructions do not say that the trial court should ordinarily fill in the name of the attempted-murder victim—even when there are multiple victims of the defendant's alleged shooting." *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 67.

¶ 105   In this case, multiple shots were fired into a group of people, and three individuals were seriously injured. The jury instructions did not specify the person injured. Rather, the instructions included the language "with the intent to kill an individual" which is consistent with the IPI Criminal instructions. Thus, the names of Charles, Jackie, and Troy were not required to be included in the jury instructions as the intent to kill a specific person is not required. As such, we find no error, as the jury was properly instructed on attempt murder. As such, there is no plain error.

¶ 106                                    C. Plain Error

¶ 107   A defendant has a due process right to a fair trial guaranteed by both the U.S. Constitution and the Illinois Constitution. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. The harmless error doctrine allows us to dispose of claims of error that have a *de minimis* impact on the outcome of the case. *People v. Blue*, 189 Ill. 2d 99, 138 (2000). Although individual trial errors may not require a reversal, multiple errors may have the cumulative effect of denying the defendant a fair trial. *People v. Speight*, 153 Ill. 2d 365, 376 (1992). "When a defendant's right to a fair trial has been denied, this court must take corrective action so that we may preserve the integrity of the judicial process." *Blue*, 189 Ill. 2d at 138.

¶ 108   The defendant raises multiple claims of error. The defendant's claims include that the circuit court abused its discretion by allowing the State to admit AT&T phone records and cell site

data analysis where the records lacked a proper self-authenticating certification; by introducing the defendant's entire videotaped interview with law enforcement into evidence; by allowing a witness to testify to the defendant's credibility based on his behavior during his interview with law enforcement; and by allowing improper lay witness testimony about the technology behind Facebook Messenger's interface. The defendant argues that these cumulative errors deprived the defendant of a fair trial.

¶ 109                                   1. *Certified Records*

¶ 110   The defendant did not object to the admission of the AT&T records at trial and he did not raise this issue in a posttrial motion. We apply plain error review to the issue of whether the AT&T records were properly admitted as this issue was not preserved on appeal.

¶ 111   "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within a recognized exception." *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). For the business record exception to apply, "the party seeking to admit a business record has the burden of laying an adequate foundation for it, which includes showing: (1) that the record was made as a memorandum or record of the act; (2) that the record was made in the regular course of business; and (3) that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter." *People v. Nixon*, 2015 IL App (1st) 130132, ¶ 110. An adequate foundation must be established by "the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11)." Ill. R. Evid. 803(6) (eff. Jan. 25, 2023).

¶ 112   Certified records may be admissible under the Illinois Rules of Evidence, if

> "[t]he original or a duplicate of a record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written certification of its custodian or other qualified person that the record

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

The word 'certification' as used in this subsection means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury ***." Ill. R. Evid. 902(11) (eff. Sept. 28, 2018).

¶ 113 The State acknowledges that the certification for the phone records did not strictly comply with Illinois Rule of Evidence 902(11), as there was no certification from a qualified AT&T records custodian that the certification was made under oath. Accordingly, the State concedes that the circuit court erred by admitting the AT&T records and the related testimony. We find clear and obvious error in admitting the AT&T records.

¶ 114 The State argues that the admission of the phone records was harmless error given the overwhelming properly admitted evidence of the defendant's guilt. "Errors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *People v. Jackson*, 2022 IL 127256, ¶ 23. We, therefore, consider whether the "evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." See *Piatkowski*, 225 Ill. 2d at 565.

¶ 115 Detectives Bennett and Lawrence both provided testimony based on the AT&T data. The State established a timeline of the defendant's movements on September 8, 2021, based on information received from the AT&T data. Lawrence created maps of the defendant's general vicinity based on cell phone tower usage, yet his testimony pinpointed the defendant to a specific location based on the general data that had not been properly certified. This testimony was prejudicial to the defendant. We consider that the firearm was not recovered, the State did not

33

present eyewitness testimony identifying the defendant as the shooter, and the identity of the shooter was not clearly visible on the surveillance video. Multiple witnesses had credibility issues. Both Terrea and Lajuane entered into agreements in unrelated criminal cases in exchange for their testimony and had provided conflicting statements to law enforcement. As the evidence in this case was closely balanced, we find that the circuit court erred in admitting the AT&T data. Therefore, we find plain error.

¶ 116        2. *Law Enforcement Interview Video and Related Testimony*

¶ 117 The defendant additionally argues that admitting the video of the defendant being interviewed by law enforcement and the related testimony regarding the defendant's credibility was also error. Once again, the defendant concedes that he failed to properly preserve the error, and requests plain error review. We consider whether the circuit court abused its discretion by admitting the defendant's law enforcement interview as the defendant preserved this issue. "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 118  Because a police officer is recognized as an authority figure, opinion statements regarding the ultimate question of fact are considered prejudicial. *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35. A statement by a police officer is admissible, however, if it is necessary to demonstrate the effect of the statement on the defendant or to explain a response by the defendant. *Hardimon*, 2017 IL App (3d) 120772, ¶ 35. An officer's testimony or statement during a video recorded interrogation is ultimately subject to relevancy requirements and should be excluded where its probative value is outweighed by any prejudicial effect. *Hardimon*, 2017 IL App (3d) 120772, ¶ 35.

34

¶ 119    The defendant's law enforcement interview video contained numerous opinion statements by Detective Bennett of the defendant's guilt. Bennett stated that he was "100% certain" that the defendant was in Oakwood Estates during the shooting, Shaquitta picked him up from Oakwood Estates after the shooting, and that "everyone and their mother" told Bennett that the defendant was with Shaquitta at Belle Manor. Bennett additionally stated, "you know that we have the right suspect," and that multiple stories were "corroborated by overwhelming evidence, *i.e.*, videos and other people's statements and the physical evidence." He further commented that they had the "whole thing pieced together on camera." Bennett also suggested that the defendant had a gun during the altercation, prior to the shooting, but was talked down from using it and later returned because a gun had been pulled on him. Bennett told the defendant that he had to take evidence to a prosecutor and show that it occurred to obtain the defendant's arrest warrant and insinuated that their investigation had proven the defendant's guilt in order to obtain an arrest warrant. The multiple statements by Bennett of the defendant's guilt had little relevance and were highly prejudicial.

¶ 120    The defendant additionally argues that the video included improper statements of other crimes or bad acts. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). If the other crimes evidence is only relevant to establish the defendant's propensity to commit crime, then it is inadmissible. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence can be overpersuasive and lead a jury to convict simply because they believe the defendant is a bad person deserving punishment. *Manning*, 182 Ill. 2d at 213-14.

¶ 121    Other crimes evidence is admissible when the evidence is relevant to establish a material question. *Manning*, 182 Ill. 2d at 214. The circuit court must weigh the probative value of other

35

crimes evidence against its prejudicial effect and may exclude the evidence if the probative value is substantially outweighed by the prejudicial effect. *Manning*, 182 Ill. 2d at 214.

¶ 122   Prior to receiving his *Miranda* warning, the defendant offered that he had been kicked out of high school and was sent to a military academy. The video also included an unredacted statement by the defendant that in the past he had punched people in the face because it was "gangster." The defendant additionally acknowledged that he had been charged with crimes in the past and had provided a story of gun violence. Those statements were overly prejudicial, and not relevant to the charged crime.

¶ 123   We additionally consider whether Bennett's "human lie detector" testimony regarding the defendant's behavior was improper. In general, it is improper to question a witness on the credibility of another witness. *People v. Becker*, 239 Ill. 2d 215, 236 (2010). Credibility determinations are made by the trier of fact. *Becker*, 239 Ill. 2d at 236.

¶ 124   In *People v. Henderson*, 394 Ill. App. 3d 747 (2009), the Fourth District addressed "human lie detector" testimony. In that case, a police officer testified at trial that the defendant's vague responses and body language during an interrogation indicated deception. *Henderson*, 394 Ill. App. 3d at 752-54. The testimony was deemed inadmissible as the "human lie detector" testimony does not comply with "the fundamental rule that one witness should not be allowed to express his opinion as to another witness's credibility." *Henderson*, 394 Ill. App. 3d at 754.

¶ 125   In this case, Bennett testified that the defendant was lying during his interview with law enforcement based on his body language and actions. Specifically, he believed that the defendant would put the coffee cup to his mouth when he would provide an answer that was inconsistent with the evidence. He additionally opined that the defendant would look directly at the camera when he was lying. The recorded interview also contained opinion statements by Bennett that the

defendant was not being truthful based on his body language. Bennett pointed out the defendant's nervousness when confronted with a conflicting story and stated that, "lying about the small things" gave him "zero credibility." Bennett commented that the defendant could roll the dice on whether people believed his story and that "if I were in your spot, I would not want to sit in front of 12 jurors."

¶ 126   The defendant's video that was over two hours long contained numerous opinion statements of the defendant's guilt, other crimes or bad acts, and statements challenging the defendant's credibility. After the video was played, Bennett was allowed to further comment on the defendant's credibility. The probative value of the video was substantially outweighed by the prejudicial effect where the defendant had not confessed to the charged crimes. The circuit court abused its discretion by allowing into evidence the lengthy law enforcement video and allowing Bennett's "human lie detector" testimony on the defendant's credibility.

¶ 127   The cumulative effect of the admission of the AT&T data, including the geolocation data, as well as the extensive commentary by law enforcement in the defendant's video interview, and the improper testimony regarding the defendant's credibility, deprived the defendant of a fair trial. Therefore, we must reverse the defendant's conviction and remand for further proceedings.

¶ 128   Although we are reversing the defendant's conviction, we find that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt on each count. We therefore find that no double-jeopardy violation will impede a new trial. *People v. Hale*, 2012 IL App (4th) 100949, ¶ 26. Furthermore, we do not reach a decision on the defendant's guilt that would be binding on retrial. *Hale*, 2012 IL App (4th) 100949, ¶ 26. In light of the our decision to remand for a new trial, we need not address the remaining issues that the defendant raised on appeal.

¶ 129                                    III. CONCLUSION

¶ 130   For the foregoing reasons, we reverse the judgment of the circuit court and remand for

further proceedings.

¶ 131   Reversed and remanded.